ESTATE OF MARY MASON, DECEASED, HERBERT L. HARRIS, ADMINISTRATOR, AND ROBERT MASON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4473-70.    Filed July 28, 1975.

*Henry A. Bornstein,* for the petitioner Robert Mason.
*Charles S. Stroad,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in and additions to the petitioners' Federal income tax:

| Year | Deficiency | Additions to tax sec. 6653(a)[1] |
|------|-----------|----------------------------------|
| 1966 | $63,280.97 | $3,164.05 |
| 1967 | 390,533.62 | 19,526.68 |

The issues to be decided are: (1) Whether the burden of proving the petitioners' gross income for 1966 and 1967 is on the Commissioner; (2) what income the petitioners actually received in 1966 and 1967; and (3) whether any part of the underpayment of the petitioners' tax for 1966 and 1967 was due to negligence or intentional disregard of rules and regulations.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petition herein was filed by Robert Mason and Mary Mason, his wife, who, on the date of the filing of such petition, were legal residents of the State of Michigan. They filed their joint Federal income tax returns for 1966 and 1967, using the cash method of accounting, with the District Director of Internal Revenue, Detroit, Mich. Mr. Mason will sometimes be referred to as the petitioner.

Since the filing of the petition, Mrs. Mason has died, and Herbert L. Harris has been appointed successor administrator of her estate. By order, the administrator has been substituted for Mrs. Mason, but he made no appearance at the scheduled trial of the case. The Commissioner moved to dismiss the case for failure to prosecute as to the estate and reported to the Court that he had been advised by the administrator that he would not appear because the estate was insolvent. The motion was taken under advisement, and when the decision is entered as to Mr. Mason's deficiency, a decision will also be entered fixing the same deficiency for the estate.

On their returns for 1966 and 1967, Mr. Mason's occupation was stated to be "investments," and his wife was said to be a homemaker. On their 1966 return, they reported gross income of $5,219.08 from the following sources:

Interest:
| | |
|---|---|
| Home Federal Savings & Loan | $319.08 |
| Public Bank | 150.00 |
| Land contracts | 970.00 |
| Rental income | 3,780.00 |

---

[1] All statutory references are to the Internal Revenue Code of 1954.

On their 1967 return, they reported gross income of $6,499.44 from the following sources:

Interest:
|  |  |
|---|---|
| Home Federal Savings & Loan | $332.64 |
| Bank of the Commonwealth | 175.00 |
| Land contracts | 911.80 |
| Rental income | 5,080.00 |

Mr. Mason maintained three bank accounts during 1966 and 1967. He had savings accounts in the Home Federal Savings & Loan Association of Detroit (Home Savings) and the Public Bank (Public), Detroit, Mich.[2] In addition, he had a checking account in the National Bank of Detroit (National). The Public and National accounts were joint accounts with his wife.

From June 1966 through December 31, 1967, the following deposits were made in the three accounts:

|  | Deposits in 1966 | Deposits in 1967 |
|---|---|---|
| Home savings | $32,570.26 | $19,848.44 |
| Public | [3] 3,414.76 | 177.71 |
| National | 121,511.46 | [4] 603,590.97 |
| Total | 157,496.48 | 623,617.12 |

The three accounts were very active in the period from June 1966 until January 1968. Approximately 250 deposits were made in the National checking account, while over 1,600 checks were drawn on that account. In addition, 37 deposits and 54 withdrawals were made in the two savings accounts.

During 1966 and 1967, Mr. Mason cashed many checks for other persons. For unexplained reasons, he cashed insurance drafts payable to the Trailer Construction Co. (Trailer) when it was otherwise unable to cash the drafts because they lacked proper endorsements. On other occasions, Mr. Mason made loans to Trailer until an insurance draft was payable. To secure the funds for the cashing of a check or for a loan, he drew his check on his National account and cashed it at Public. When a loan had been made, Trailer gave Mr. Mason its note, bearing interest.

[2] The Bank of the Commonwealth assumed Public's bank operations in January 1967. All references to Public will include its successor, Commonwealth.

[3] The parties have stipulated that this amount is $3,714.81. However, the record indicates that the stipulated amount included interest paid on the savings, which should not be included as a deposit.

[4] Although the bank records show that a slightly larger amount was deposited, we accept the figure $603,590.67 because it was agreed to by the parties.

When Trailer received the insurance draft, it was given to Mr. Mason who deposited it in his National account. Trailer was a construction company specializing in fire repairs. Mr. Mason performed similar services for other unnamed companies.

In order to provide the funds for his loans, Mr. Mason frequently "kited" checks. The kiting operation took place in the following manner. First, he drew a check on his National account and cashed it at Public, where he knew an officer who would cash his checks without inquiring to see whether there were sufficient funds at National to cover the check. The proceeds were used for a loan. If the loan was not repaid by the time his first check reached National for final payment through the bank collection process, he cashed a second check at Public and deposited the proceeds at National to cover the first check. These steps were repeated if the loan was not repaid by the time the second check reached National for payment. The cycle ended when the loan was repaid and the proceeds deposited in the National account.

A revenue agent was assigned to investigate the petitioners' tax returns for 1966 and 1967. Since Mr. Mason was in prison at the time for an arson conviction, the agent contacted Mrs. Mason to arrange an examination of their books and records. She informed him that she did not know of any records. The agent then visited Mr. Mason in prison, who told the agent that he kept no books or records. He did disclose that he had three bank accounts, which the agent then investigated.

When the agent discovered the large number of deposits in the three accounts, he became very suspicious and asked Mr. Mason for an explanation. Mr. Mason said he used the accounts to "float" checks in order to gain the use of money without paying interest on it. He said that he would cash a check drawn on National and cover it 3 days later with a check drawn on Public. By continuing this process, he claimed that he could acquire the use of funds without interest charges. The agent did not believe such story since the Public account was a savings account and not a checking account. Furthermore, there was no correlation between the deposits and withdrawals in the two accounts. When the agent asked Mr. Mason for his canceled checks and deposit receipts and requested that he prepare a list of the deposits, indicating the source of each, Mr. Mason first told the agent that he would have an assistant provide him with such information. After allowing the assistant sufficient time to prepare the

information, the agent contacted him and was then told that the canceled checks and deposit receipts had been destroyed, and Mr. Mason refused to provide any information as to the source of the deposits. Nor did the financial institutions have any retained copies of the canceled checks and deposit receipts. At no time did Mr. Mason describe to the agent his activities of cashing checks for and making loans to other persons.

After all efforts to obtain additional information failed and the petitioners refused to cooperate by providing any further help, the agent attempted to compute their income based upon their bank deposits. By correlating the deposits and withdrawals in the three accounts, he determined that $27,190.24 in 1966 and $21,618.85 in 1967 represented transfers from one account to another. The balance of the deposits was determined to be income. The agent also determined that the petitioners had used $3,000 in cash each year for personal living expenses that came from unreported income. Thus, the Commissioner determined that the petitioners had gross income of $133,606.29 in 1966 and $605,007.27 in 1967.

At the trial of this case, Mr. Mason, for the first time, described his kiting activities. Although, in his testimony, he described such activities generally, he offered no documentary evidence in support of such testimony; for example, he did not offer any notes evidencing the claimed loans. Nor did he even attempt to identify the specific deposits as representing the proceeds of his kiting activities. At the conclusion of the trial, the Court requested the parties to examine the evidence, including the ledgers of deposits, and confer to ascertain whether they could agree on the amount of deposits that were due to kited checks. The parties were unable to agree, but thereafter, the Commissioner conceded that $41,383.08 of the deposits in 1966 and $300,860.02 of the deposits in 1967 resulted from kited checks and thus were not income.

We find that the following deposits in the three accounts were not income:

| | Amount in 1966 | Amount in 1967 |
|---|---|---|
| Transfer from Public to National | $4,353.24 | $7,244.41 |
| Transfer from Home Savings to National | 19,272.00 | 7,611.30 |
| Transfer from National to Home Savings | 9,618.75 | 11,600.00 |
| Transfer from National to Public | 65.00 | 0 |
| Kited checks and repaid loans | 68,015.40 | 506,215.24 |
| Total | 101,324.39 | 532,670.95 |

The balance of the deposits each year was gross income. Since such balances may have included the rental income and the income from land contracts, both of which were reported each year, the amount so reported must be subtracted from such balances in determining the amount of unreported income for each year. Accordingly, the petitioners had unreported income of $51,422.09 in 1966 and $84,954.37 in 1967.

The petitioners' underpayment of tax was due to negligence or intentional disregard of the rules and regulations for maintaining books and records and for reporting income.

## OPINION

The first issue to be decided is who bears the burden of proof in this case. In view of the nature of the available evidence, such issue is critical in reaching the ultimate decision in the case. The petitioners failed to maintain books or records sufficient to establish the amount of their gross income. See sec. 1.6001-1(a), Income Tax Regs.; *Stein v. Commissioner*, 322 F. 2d 78 (5th Cir. 1963), affg. a Memorandum Opinion of this Court. Because of their failure to keep such records, and because of his conclusion that their returns did not correctly reflect their income, the Commissioner decided to compute the petitioners' income by use of the bank deposit method.

The use of the bank deposit method for computing income has long been sanctioned by the courts. See, e.g., *Goe v. Commissioner*, 198 F. 2d 851 (3d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 897 (1952); *Halle v. Commissioner*, 175 F. 2d 500 (2d Cir. 1949), affg. 7 T.C. 245 (1946), cert. denied 338 U.S. 949 (1950); *Mauch v. Commissioner*, 113 F. 2d 555 (3d Cir. 1940), affg. 35 B.T.A. 617 (1937); *Oliver v. United States*, 54 F. 2d 48 (7th Cir. 1931), cert. denied 285 U.S. 543 (1932); *John Harper*, 54 T.C. 1121 (1970); *Thomas B. Jones*, 29 T.C. 601 (1957); *Joseph Calafato*, 42 B.T.A. 881 (1940), affd. per curiam 124 F. 2d 187 (3d Cir. 1941); 2 Mertens, Law of Federal Income Taxation, sec. 12.12, pp. 46-50, 71-79 (1967). Though not conclusive, bank deposits are prima facie evidence of income. See *Boyett v. Commissioner*, 204 F. 2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court; *Hague Estate v. Commissioner*, 132 F. 2d 775 (2d Cir. 1943), affg. 45 B.T.A. 104 (1941), cert. denied 318 U.S. 787 (1943).

Where the petitioner has failed to maintain adequate records as to the amount and source of his income, and the Commissioner has determined that the deposits are income, the petitioner has the burden of showing that the determination is incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure; see *Marcello v. Commissioner*, 380 F. 2d 494 (5th Cir. 1967), revg. on other grounds a Memorandum Opinion of this Court; *Hague Estate v. Commissioner, supra; Hoefle v. Commissioner*, 114 F. 2d 713 (6th Cir. 1940), affg. a Memorandum Opinion of this Court; *Jesse Ullman Reaves*, 31 T.C. 690 (1958), affd. 295 F. 2d 336 (5th Cir. 1961); *Herman J. Romer*, 28 T.C. 1228 (1957). When, in such a case, the petitioner has the burden of proof, the Commissioner need not prove a likely source of the unreported income. *Armes v. Commissioner*, 448 F. 2d 972 (5th Cir. 1971), revg. on other issues a Memorandum Opinion of this Court. Nor is he required to prove that all the deposits are income. *Albert Gemma*, 46 T.C. 821 (1966). The burden of showing duplications is on the taxpayer. *Pearl Zarnow*, 48 T.C. 213 (1967).

The petitioner contends that the Commissioner was arbitrary and incorrect in his determination so that he bears the burden of proof. See *Helvering v. Taylor*, 293 U.S. 507 (1935). We do not agree. When a taxpayer keeps no books or records, has large bank deposits, and offers no plausible explanation of such deposits, the Commissioner is not arbitrary or capricious in resorting to the bank deposit method for computing income. *Hague Estate v. Commissioner, supra; John Harper, supra.*

The petitioner relies primarily upon *Cohen v. Commissioner*, 266 F. 2d 5 (9th Cir. 1959), revg. a Memorandum Opinion of this Court, as authority for his contention. Mr. Cohen was a "betting commissioner" who placed bets for his customers for a commission. As a result, substantial amounts of money were deposited in his account, but most of the money was ultimately paid to the winners of the bets. The Commissioner determined that all of the deposits were income and refused to allow a deduction for any payments to the winners. The Commissioner's method of computing income was found to be arbitrary and erroneous, thus placing the burden of proof on him. The petitioner in the present case argues that since he has shown that at least some of the deposits were not income, the determination in this case must have likewise been arbitrary and erroneous.

The petitioner's reliance on *Cohen* is misplaced. When the Commissioner's agent in this case was conducting his audit of the petitioner's tax returns, the petitioner offered no books and records to establish that the deposits were not income; nor did he offer any credible statements indicating that many of such deposits were not income. The agent contacted Mr. Mason on several occasions and provided him with an opportunity to submit any evidence that he wished. Though Mr. Mason first claimed otherwise, he finally admitted that any records had been destroyed. Although he was given an opportunity to submit a schedule indicating which deposits represented the proceeds of check kiting, he made no attempt to identify such deposits. His statement about "floating checks" was patently unbelievable. Not until the trial did Mr. Mason reveal his arrangements for kiting checks. In his brief, the petitioner admits that any mistakes which may have been made by the agent in preparing the determination were not his fault. Under such circumstances, the agent was fully justified in computing the petitioner's income by reliance upon the bank deposits and excluding from income only those deposits which he could find were not income on the basis of the evidence available to him. A petitioner cannot refuse to cooperate with the agent conducting a tax investigation and then claim that the resulting determination by the Commissioner was arbitrary when the agent acted reasonably, taking into consideration the information available to him. See *Marko Durovic,* 54 T.C. 1364, 1390 (1970), affd. in part, revd. in part on other grounds 487 F. 2d 36 (7th Cir. 1973), cert. denied 417 U.S. 919 (1974); cf. *E. Jan Roberts,* 62 T.C. 834, 836-837 (1974).

Furthermore, the evidence presented by the petitioner at the trial showed that some of the deposits were not income, but such evidence does not establish that the use of the bank deposit method was invalid or arbitrary. As a result of the petitioner's failure to furnish the agent with any information as to the check-kiting operation during the course of the audit, the use of the bank deposit method resulted in an overstatement of the petitioner's income, but such an overstatement of income, under these circumstances, is not at all indicative that the determination was arbitrary. See *Foster v. Commissioner,* 391 F. 2d 727 (4th Cir. 1968), affg. on this issue a Memorandum

Opinion of this Court; *Marcello v. Commissioner,* 380 F. 2d at 497; *John Harper,* 54 T.C. at 1129.

The petitioner further argues that because the Commissioner has conceded that his original determination was incorrect after hearing the evidence at trial, the burden of proof should shift to him. The concession merely relieved the petitioner of a portion of his burden of proof; it did not affect the petitioner's burden as to those deposits not conceded. See *Mills v. Commissioner,* 399 F. 2d 744 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; *Fada Gobins,* 18 T.C. 1159 (1952), affd. per curiam 217 F. 2d 952 (9th Cir. 1954); see also *Commissioner v. Estate of Leyman,* 344 F. 2d 763 (6th Cir. 1965), modifying on other grounds 40 T.C. 100 (1963), revd. per curiam on other grounds 383 U.S. 832 (1966). Consequently, we hold that the petitioners must bear the burden of proof as to the deposits not conceded.

Having reached that conclusion, we must now examine the petitioner's evidence. The evidence in this case is very sketchy. The petitioner testified that many of the deposits resulted from his cashing of checks for, and making loans to, other persons and from check kiting. He only testified about one specific "client"— Trailer—and while he alluded to many other companies, he did not name any of them. Furthermore, he never testified concerning specific checks or loans; he never attempted to relate any specific deposit to the loans, nor did he attempt to relate any specific kited checks to any deposits. Mr. Mason was not an altogether forthright witness, and in view of his prior statements, we found his testimony not very convincing.

Mr. Mason's testimony was partially corroborated by the testimony of Trailer's bookkeeper, who testified that the petitioner frequently cashed checks or made loans to her company, but she contradicted him on one crucial point. Mr. Mason claimed that he earned no income from his loans and cashing of checks for others, but she said that the company gave him interest-bearing notes for the loans and that he kept a portion of the checks cashed by him. The bookkeeper did not know the total amount of loans made by Mr. Mason, the number of checks cashed by him, nor the amount received by him from these transactions.

An officer of Public, where Mr. Mason cashed many of his checks, also corroborated some of his story. The officer confirmed that he approved many checks which Mr. Mason presented to be

cashed, without ascertaining whether there were sufficient funds in the National account to cover the checks, but he could provide no specific information concerning the source of the deposits made by Mr. Mason, other than what Mr. Mason had told him.

The only other evidence is the ledgers maintained by the financial institutions with respect to the three accounts. Those ledgers show the amounts of withdrawals and deposits, but they do not reveal the sources of the deposits or any information as to the reasons for the withdrawals. Because Mr. Mason destroyed all deposit receipts and checks, it is impossible to determine the source of the deposits. Nevertheless, considering the testimony of the witnesses, we are satisfied that a substantial part of the deposits were not income, and the Commissioner has so conceded. On the other hand, the evidence shows that, without doubt, Mr. Mason failed to report his entire income. There is credible testimony that he earned income as a result of his cashing of checks for others and making loans to them, but no such income was reported on his returns. Moreover, the deposits in the Home Savings account, which could not have been due to check kiting, exceeded the reported income. Finally, according to Mr. Mason's testimony, none of the deposits of less than $500 were due to check kiting, and when such deposits are totaled, they, without more, reveal that Mr. Mason had income in excess of that reported by him.

In reaching the conclusions set forth in our findings of fact, we examined carefully the ledgers from the three financial institutions to determine which deposits constituted mere transfers from one account to another. The Commissioner determined that such transfers amounted to $27,190.24 in 1966 and $21,618.85 in 1967. We accepted the deposits conceded by him to have been transfers and also allowed any other deposit where there was a withdrawal from another account within 4 banking days preceding the deposit. If money was merely being transferred between accounts, such period appears to allow a reasonable time between withdrawal and deposit of the money.

The more difficult problem occurred in determining how much of the deposits in the National checking account resulted from repaid loans and kited checks. A deposit to cover a kited check must have been made after the check was cashed at Public but before it was cleared for payment by National. Since we do not know the dates on which checks were cashed, but only when they

were paid by National, the only indication of a kited check to be drawn from the ledgers was that if the check was paid within 3 banking days after a deposit, the check may have been kited. If the check was paid before the date of a deposit, and if there were already sufficient funds in the National account to cover the check, such a check was clearly not kited. On the other hand, if a check was paid before a deposit and resulted in an overdraft of the account, the check may have been kited, and we have treated it as such. Since Mr. Mason testified that all checks of less than $500 were written for personal purposes, we have treated such checks as not kited, other than those which the Commissioner conceded were kited. Except for the small checks not considered kited, and except for transfers from one financial institution to another, we have treated each withdrawal made within 3 banking days after a deposit as a kited check.

Deposits which represented repayment of loans or the proceeds of checks cashed for others were determined by the same method used to distinguish kited checks. According to Mr. Mason, when he made a loan, he did so by writing a check on his National account. If the loan was repaid before the check was cleared for payment, the proceeds of the loan were deposited to cover the check. Similarly, when he cashed a check for another, he secured the necessary funds by writing a kited check, and if he could cash the other's check before his kited check cleared, he deposited those proceeds to cover his kited check. Thus, in the case of either the repayment of loans or the proceeds of checks cashed for others, deposits must have been made within 3 days before his kited checks cleared.

In applying these guidelines for determining which deposits did not represent income, we have excluded from income any deposit that might, based on the available evidence, represent the proceeds of a kited check. Thus, this method is surely as fair to the petitioner as we can be in the light of the available evidence, and if he feels that it has resulted in an overstatement of his income, he must recognize that our inability to compute his income by use of some more exact method is due to his failure to keep records and his failure to even attempt to relate any of the deposits to checks claimed to have been kited.

The petitioner contends that his situation is similar to that in *Teichner v. Commissioner*, 453 F. 2d 944 (2d Cir. 1972), revg. a Memorandum Opinion of this Court. The taxpayers in *Teichner*

kited checks to hold off their creditors. They convinced the Tax Court that most of their deposits were from kited checks but lacked specific evidence as to approximately $30,000. In reversing the Tax Court's decision for the Commissioner, the Court of Appeals accepted the taxpayers' uncontroverted testimony and found that all of the deposits were from kited checks. However, the petitioner's situation is different from that in *Teichner,* in several significant ways. In *Teichner,* the court found the witnesses to be believable, and the taxpayers produced canceled checks covering most of the deposits. Whereas, in the case before us, the petitioner was not an altogether convincing witness, and he produced no canceled checks, nor any other specific evidence as to the source of any of the deposits. Moreover, in this case, there is clear evidence that the petitioner had some unreported income.

The petitioner also argues that he maintained a frugal standard of living, that from such fact it is obvious that he did not receive and enjoy any large amounts of income, and that if the Commissioner had computed his income by use of the "net worth" method, the result would have been altogether different. We have considered the evidence as to the petitioners' standard of living, but that evidence is outweighed by the large amount of unexplained bank deposits. There is no requirement that the Commissioner use the net worth method for computing income. See *Price v. United States,* 335 F. 2d 671 (5th Cir. 1964). He may use the bank deposit method, and in this case, the use of that method has produced convincing evidence of large amounts of unreported income.

Finally, the petitioner asserts that in view of the fact that he made deposits in financial institutions and withdrawals from them, it is clear that he was not attempting to conceal his activities. Yet, although we have a record of the dates and the amounts of the deposits and withdrawals, he has succeeded in concealing the source of those deposits and the purpose of the withdrawals; thus, it cannot be said that his conduct was above suspicion, and there is no reason to infer that he reported all of his income.

The Commissioner included in the petitioners' income for each of the years $3,000 as cash spent for living expenses. However, we do not agree with that adjustment in this case. The large amount of unexplained bank deposits was more than ample to cover such

living expenses, and since we have found such bank deposits to be income, there is no justification for adding to them the amounts spent by the petitioners for their living expenses.

The third issue to be decided is whether the petitioners' underpayment of tax for 1966 and 1967 was due to negligence or intentional disregard of rules and regulations. Sec. 6653(a). The petitioner has the burden of proof on this issue. *Vaira v. Commissioner*, 444 F. 2d 770 (3d Cir. 1971), affg. on this issue 52 T.C. 986 (1969); *Mark Bixby*, 58 T.C. 757 (1972); *Inter-American Life Insurance Co.*, 56 T.C. 497 (1971), affd. per curiam 469 F. 2d 697 (9th Cir. 1972); *Terry C. Rosano*, 46 T.C. 681 (1966); *David Courtney*, 28 T.C. 658 (1957). Since he has failed to offer proof on this issue or even raise it in his brief, we sustain the Commissioner's determination as to the additions to tax. Rule 149(b), Tax Court Rules of Practice and Procedure; see *James S. Reily*, 53 T.C. 8 (1969); *James W. England, Jr.*, 34 T.C. 617 (1960).

*Decision will be entered under Rule 155.*