DELBERT and GERTRUDE STODDARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stoddard v. Commissioner
Docket No. 7158-77.
United States Tax Court
T.C. Memo 1981-92; 1981 Tax Ct. Memo LEXIS 648; 41 T.C.M. (CCH) 994; T.C.M. (RIA) 81092; February 26, 1981. Delbert and Gertrude Stoddard, pro se. David T. Karzon, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and an addition *649 to tax under section 6653(a), I.R.C. 1954, [1] for the calendar years and in the amounts as follows: Additions to Tax
Deficiencies in
I.R.C. 1954
Year
Income Tax
Section 6653(a)
1972
$ 3,643.15
$ 182.16
1973
4,093.97
204.70
1974
5,309.37
265.47
The issues for decision are (1) whether petitioner had taxable income from the sale of antiques for each of the years here in issue and, if so, the amount of such income; (2) whether petitioner was in the trade or business of selling antiques so that in determining whether the assessment and collection of a deficiency for the taxable year 1972 are barred by the Statute of Limitations omitted income should be determined under section 6501(e)(1)(A)(i); and (3) whether petitioners are liable for the additions to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Delbert and Gertrude (petitioner) Stoddard, husband and wife, resided in Moro, Illinois, at the time of the filing of their petition in *650 this case. Petitioners filed their joint Federal income tax return for the calendar years 1972, 1973, and 1974 with the Internal Revenue Service Center at Kansas City, Missouri. Petitioner's husband worked as an electrician for seven different construction and electrical companies during the years here in issue. In addition, he is also a minister. Prior to 1972 petitioner had collected antiques for approximately 15 years. Petitioner's purchases and sales of antiques became more extensive in 1972. In fact, 1972 was the first year in which petitioner's purchases of antiques totaled more than $ 10,000. The principal reason for the increase in purchases was the fact that petitioner's husband allocated more of his time to his work as an electrician and less to his work as a minister, thereby producing more spendable income. During the years in issue, petitioner, in order to make her purchases of antiques, would travel extensively in and around the Moro, Illinois, area. She would also attempt to purchase antiques during any trips which she and her husband would take, including purchases made in New Mexico, Arizona, and California in 1973 and 1974 while en route to California *651 to visit her daughter. These purchases were made generally from individuals but also from antique shops and at estate sales. Petitioner made all purchases by checks written on the joint checking account which she had with her husband. However, she did not maintain any contemporaneously prepared records with respect to the time, place, or amount of her purchases or to the number of miles driven. In order to make these large purchases of antiques, petitioner would spend practically all of her husband's earnings and would sell antiques to raise money for additional purchases. In addition, petitioner would borrow significant amounts of money to make still further purchases. The following schedule sets forth the original loans, and not mere renewals, which petitioner obtained to use for the purchase of antiques in the years indicated: 1972
Loan Date
Institution
Loan Proceeds
2-28-72
Alton Banking and Trust Company
$ 2,300.00
4-24-72
Alton Banking and Trust Company
500.00
9-27-72
Beacon Finance Company
234.64
1-14-72
Staunton Home Association
1,600.00
TOTAL
$ 4,634.64
1973
Loan Date
Institution
Loan Proceeds
3-12-73
Alton Banking and Trust Company
$ 450.00
4-9-73
Alton Banking and Trust Company
600.00
4-17-73
Alton Banking and Trust Company
800.00
2-28-73
Liberty Loan Corporation
200.15
8-20-73
Alton Banking and Trust Company
1,704.34
TOTAL
$ 3,754.49
*652 1974
Loan Date
Institution
Loan Proceeds
2-15-74
Alton Banking and Trust Company
$ 600.00
3-12-74
Beacon Finance Company
457.17
5-17-74
Alton Banking and Trust Company
700.00
TOTAL
$ 1,757.17
The proceeds of each of these above-stated loans were deposited in their full amount in either petitioner's savings or checking account with the exception of the loan from the Beacon Finance Company on March 12, 1974. Petitioner deposited only $ 405 of this loan out of the total of $ 457.17. Accordingly, the total amount of loans deposited in 1974 was $ 1,705. Petitioner was a member of the Gateway Carnival glass Club, the International Carnival Glass Association, Inc., and the Heart of America Carnival Glass Association. During 1972, 1973, and 1974 petitioner sold antiques. These sales were made to individuals including those who regarded themselves as antique dealers and also to various antique shops. Petitioner sold a wide variety of antique items including furniture, clocks, lamps, and glassware. Generally, from the merchandise which petitioner purchased, she would keep what she regarded as the best merchandise for herself and would offer the *653 rest for sale to the public. A significant part of petitioner's sales resulted from her appearances at various flea markets or antique shows. Petitioner regularly rented space at the Godfrey Antique and Coin Show. The show was held at the Godfrey Civic Center on a monthly basis except it was not held during the months of July and August. In 1972 petitioner rented space for each of the 10 months that the show was held. In 1973 the only records of the Godfrey Antique and Coin Show which are available are for the shows held in January, February, and March. Petitioner rented space for each of these shows and for other shows during the year. There are no records for 1974 of the Godfrey Antique and Coin Show since these records were destroyed in a flood. Petitioner rented space at some of the shows in 1974. At the shows which she attended, petitioner rented three tables which was the maximum number rented to any one person. The charge for the three tables was $ 22 per show. The total number of tables which would be rented at a show varied between 75 and 90 and between 25 and 35 dealers would be represented. The show would run for one day and would open at 9:00 a.m. and close *654 at 5:00 p.m. During the spring and fall months the crowds would average less than 100 people but during the winter months would number in the hundreds. The majority of petitioner's merchandise at these shows was European glassware, Carnival glass, lamps, and other types of glassware. Compared with other sellers, the quality of her merchandise was regarded as good. During the yeas in issue petitioner rented space from Mr. and Mrs. Donald Roberts at flea markets held at various locations. In 1972, she rented space at two separate flea markets held at the Berkeley Knights of Columbus Hall. In 1973, petitioner rented space from Mr. and Mrs. Roberts at two different flea markets held at the Creve Coeur Country Club. Petitioner rented space at seven flea markets held in 1974. Most all of the flea markets were held on Sunday but some were held on Saturday. Petitioner did not maintain any records which reflected the amount of rental payments nor any records of the exact days which she rented space from Mr. and Mrs. Roberts. Petitioner sold some merchandise at auctions. On February 20, 1972, Ted Stumpf of Stumpf Auction Co., Mascoutah, Illinois, held an auction for petitioner. *655 The gross proceeds from the auction totaled $ 2,474.50. The total expenses incurred by petitioner as a result of the auction amounted to $ 425.62 which consisted of advertising expenses of $ 153.17, $ 25 for the rental of the hall, and commissions in the amount of $ 247.45. The merchandise sold for petitioner at the Stumpf Auction consisted of merchandise which she had purchased at various estate auctions which she did not personally want to keep in her home. Petitioner received from A. Middendorf and Sons Auction Co. of Jacksonville, Illinois, a check in the amount of $ 1,619.50 dated January 13, 1973, as the proceeds from an auction and received a check in the amount of $ 508.70 dated March 5, 1973, representing the proceeds from another auction. Petitioner did not maintain any records with respect to her purchases and sales of antiques. Although all of petitioner's purchases of antiques were by check, some of the checks which she received for the sale of merchandise were negotiated for cash and were not directly deposited in either her checking or savings account. When she sold merchandise, petitioner did not give the purchaser a receipt nor was she given receipts when she *656 made purchases of antiques from third parties. Petitioner did not file a Schedule C (Profit or (Loss) From Business or Profession) with her joint return for any of the years 1972, 1973, or 1974. In 1975, petitioner asked a tax return preparer to prepare a rough draft of a Schedule C for the tax year 1972. This rough draft, which was never filed, listed $ 3,000 as gross receipts which was an estimated figure given to the preparer by petitioner. In addition to other operating business expenses totaling $ 1,262, the form also contained an estimated cost of goods sold of $ 1,957. Although the tax return preparer who completed the rough draft Schedule C also completed the actual returns filed by petitioner for the years 1972, 1973, and 1974, he was not furnished with any information regarding the sale of antiques at the time those returns were prepared. In 1972, petitioner filed an Illinois Retailers' Occupational Tax Return for eight separate months. The amounts paid for each month are as follows: 1972
Amount
January
$ 5.18
February
7.43
March
6.00
April
6.53
May
10.68
June
7.03
October
4.75
December
12.20 (paid on 1-30-73)
Petitioner's husband *657 received his paycheck from the various contractors for whom he worked either on Wednesday, Thursday, or Friday, depending on the schedule of the individual contractor. After receiving the check, he would turn it over to petitioner. Petitioner would cash the check generally at a chain store or at the First Federal Savings and Loan in Edwardsville, Illinois. The checks were cashed because she would purchase groceries, gas, and other household items on the weekends and would always pay cash for these items. As all of petitioner's antique shows were either on Saturday or Sunday and purchasers of her merchandise would pay both in cash and by check, she would have cash in her home over the weekend in addition to that received from her husband's paycheck. All currency was kept together in her home and whatever cash was left after she paid the above-stated expenses and retained some spending money, would be deposited in her bank account on Monday or Tuesday of the following week. Petitioner always made a bank deposit on either Monday or Tuesday although the deposit may have been small. The normal interval between the time that petitioner cashed her husband's paycheck and made the bank *658 deposit was four days. Petitioner's husband received total pay for his work as an electrician of $ 15,093.65, $ 14,455.60, and $ 15,485.62 for the years 1972, 1973, and 1974, respectively. After withholding for Federal and state income taxes and other miscellaneous items, the net pay received by petitioner's husband in each of the years 1972, 1973, and 1974 was $ 11,699.84, $ 10,365.28, and $ 11,586.75, respectively. Petitioner owned two pieces of residential rental property during the years in issue, located at 106 North Sixth Street, Benld, Illinois, and 511 Truman, Moro, Illinois. Petitioner's tenants paid their monthly rent either by check or cash. When she received a rental payment in cash, petitioner would sometimes spend part of it for household expenses but most of it was eventually deposited. Because of petitioner's lack of books and records, respondent used the bank deposits method to reconstruct her income. Under this method, petitioner's income from the sale of antiques for each of the years in issue was determined to be the amount of the total deposits to her bank account less the identifiable deposits attributable to loans or other taxable income reported for *659 each of the years in issue. Petitioner's total deposits for the years 1972, 1973, and 1974 were $ 28,899.76, $ 25,145.70, and $ 29, 558.90, respectively. In his notice of deficiency respondent determined that petitioner had gross receipts or sales from self employment of $ 15,453.77, $ 14,988.19, and $ 18,387.37 for the years 1972, 1973, and 1974, respectively. [2] In this regard he stated that: *660 In the absence of adequate records for the taxable years ended December 31, 1972, December 31, 1973, and December 31, 1974, your net earnings from self-employment are computed with reference to bank deposits for determination of gross receipts or sales. He determined that petitioner was entitled to a deduction for cost of goods sold in the amounts of $ 1,957, $ 1,897.50, and $ 2,327.84 for the years 1972, 1973, and 1974, respectively. Respondent also allowed petitioner business expense deductions for sales tax, table rent, expense of auction, commission to daughter, mileage to shows, mileage for purchases, and advertising in the amounts of $ 1,886.72, $ 319.64, and $ 551 for the years 1972, 1973, and 1974, respectively. With respect to these deductions, respondent stated: Deductions are allowed to the extent substantiated by you as for ordinary and necessary business expenses. The cost of goods sold for 1972 is from information furnished by you. Because of inadequate records, the cost of goods sold for 1973 and 1974 are computed as 12.66% of gross receipts or sales, the same as for 1972. Respondent determined that petitioner was liable for an addition to tax under section *661 6653(a) for each of the years here in issue for negligence or intentional disregard of rules and regulations. ULTIMATE FINDINGS OF FACT (1) Of the deposits made to petitioner's bank account, the amounts of $ 18,806.63, $ 14,557.51, and $ 16,247.93 were from sources other than petitioner's sale of antiques. (2) Petitioner had the following business expenses from her sale of antiques in the years involved: 1972
1973
1974
Sales tax
$ 59.80
$ 12.20
Table rent
252.00
252.00
$ 252.00
Expense of auction
425.62
361.50
Commission to daughter
562.00
Mileage to shows
41.40
41.76
199.50
Mileage for purchases
531.40
500.00
500.00
Advertising
44.50
TOTAL
$ 1,916.72
$ 1,167.46
$ 951.50
(3) Petitioner's purchases of antiques totaled $ 11,102 in 1972, $ 10,284 in 1973, and $ 13,515 in 1974. Of these purchases one-half or $ 5,551, $ 5,142, and $ 6,757.50 for the years 1972, 1973, and 1974, respectively, was the cost of the items she sold. OPINION The first issue to be decided is whether petitioner had income derived from the sale of antiques in each of the years here in issue and, if so, the amount of that income. Petitioner takes the *662 position that her sales produced no income since antique collecting was a hobby with her and until she sold all items she purchased she should not be considered to have income. Clearly, when petitioner sold an item she purchased for more than she paid for it, she had gross income from the sale of that particular item. Petitioner failed to maintain books or records sufficient to establish the amount of gross income from her sale of antiques. See section 1.6001-1(a), Income Tax Regs. Because of her failure to keep such records, respondent used the bank deposits method of reconstructing her income. The determination of income through the bank deposits method is acceptable and is not arbitrary. See Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977), and cases cited therein. Where, as in this case, respondent has determined that certain deposits are income, the burden of proof is upon petitioner to show that his determination was in error. Rule 142(a), Tax Court Rules of Practice and Procedure; Estate of Mason, supra at 657. Petitioner argued that respondent's bank deposits method of computing *663 her income was incorrect for a number of reasons. First, she contended that the full amount of her husband's paychecks from various contractors were not subtracted from total deposits. For example, while the parties stipulated that her husband was paid a net amount after taxes of $ 10,393.44 from the L.E. Myers Co. in 1972, petitioner pointed out that only $ 7,002.11 was deducted from the total deposits in her checking account. However, petitioner could not specifically identify any additional deposits, other than those for which respondent gave her credit, that were attributable to paychecks from the L.E. Myers Co. Petitioner testified that it was her habit to cash the paychecks at the time they were received, which was generally at the end of the week, and then use the cash to purchase such household items as groceries and gas over the weekend. The remaining cash was then deposited on Monday or Tuesday of the following week. From her testimony then, the difference between her husband's net pay for 1972 and the amount of cash deposited can be reasonably accounted for as cash retained for household expenses and spending money. However, the record shows that petitioner followed *664 the same procedure in 1973 and 1974 as in 1972 of withholding from her husband's weekly checks only items for household expenses. Considering the record as a whole, we have determined that petitioner deposited $ 3,500 more from her husband's pay checks in 1973 than respondent either determined or conceded, and $ 4,000 more in 1974. We have, accordingly, in our ultimate findings adjusted the identified deposits. Petitioner also contended that the bank deposits method was incorrect because respondent did not exclude the full amount of all loans allegedly deposited by petitioner. Specifically, she contended that respondent did not deduct the proceeds of a loan from Liberty Loan Corporation in the amount of $ 308.96. Respondent did not do so because there was no corresponding deposit in either petitioner's checking or savings account in and around August 28, 1973, the date which appeared on the canceled loan check and on the loan ledger sheet. Petitioner did not identify any deposit in either of her accounts which could be attributed to this loan. In addition, she did not present any other evidence at trial which would establish that there were additional deposits attributable *665 to loans other than those which respondent determined in the deficiency notice or conceded at trial. Based on all of the evidence, we conclude that petitioner had unreported income from the sale of antiques of $ 10,093.13, $ 10,588.19, and $ 13,310.97 for the years 1972, 1973, and 1974, respectively. With respect to business expenses, in our view petitioner is entitled to amounts in excess of those allowed by respondent in his deficiency notice for certain items. In addition to the Godfrey Antique and Coin Show, petitioner also incurred expenses for table rent at flea markets held by Mr. and Mrs. Roberts for two shows in 1972, two shows held in 1973, and seven shows held in 1974. She also incurred costs for the Godfrey Antique and Coin Show in 1973 and 1974 of which that company had no record. Using an estimated cost of $15 per show for the flea market shows and estimating the correct amounts of expenses attributable to table rent on the Godfrey shows for which no records were expense of $ 252 for each of the years 1972, 1973, and 1974. We also conclude that petitioner incurred some expenses with respect to the two auctions held for petitioner by the A. Middendorf and Sons *666 Auction Co. in 1973. Based on the expenses incurred in connection with the Stumpf Auction in 1972, we find that petitioner incurred auction expenses of $ 361.50 in 1973. Petitioner argues that she incurred expenses for travel in connection with her purchases and sales of antiques far in excess of the amounts allowed by respondent. From the evidence, we conclude that petitioner did have travel expenses for the purchase of antiques in each of the years 1973 and 1974 in excess of that allowed by respondent and have therefore concluded that petitioner is entitled to deduct $ 500 in each of these years as travel to purchase antiques rather than the amount determined by respondent. The final determination to be made with respect to petitioner's income and expenses from her antique activities is the amount of the cost of goods sold for the years in issue. Because petitioner did not maintain any records with respect to her purchases or sales of antiques, respondent accepted the cost of goods sold entry of $ 1,957 contained in the rough draft estimate Schedule C for the year 1972 which was prepared in 1975 by petitioner's tax return preparer. Respondent computed the cost of goods sold *667 for 1973 and 1974 by multiplying 12.66 percent times the gross receipts for each of those years. That percentage was determined by dividing $ 1,957, the cost of goods sold for 1972, into the gross receipts for that year. As stated above, we have found that petitioner had income from the sale of antiques of $ 10,093.13 in 1972. Based on the evidence presented, we do not believe that petitioner's markup was so high that she could have realized sales of $ 10,000 on goods that only cost her $ 2,000. Petitioner testified that she had been collecting antiques for approximately 15 years prior to 1972. She stated that during the years in issue she would keep the best merchandise for herself and sell off the rest, using the proceeds from those sales to purchase more antiques. Overall, petitioner testified that every year she purchased more antiques than she had sold. Based on petitioner's testimony and comparing it with the gross receipts of $ 10,093.13, $ 10,588.19, and $ 13,310.97 for the years 1972, 1973, and 1974, respectively, we find that a cost of goods sold for each of the years in issue equal to 50 percent of the purchases for each of those years to be a reasonable amount. *668 Using the figures for the purchases as determined above from an analysis of petitioner's checks, we find that the cost of goods sold was $ 5,551, $ 5,142, and $ 6,757.50 for the years 1972, 1973, and 1974, respectively. After deducting the business expenses and the cost of goods sold, petitioner had net earnings from sales of antiques of $ 2,625.41, $ 4,278.73, and $ 5,601.97 for the years 1972, 1973, and 1974, respectively. The second issue presented is whether respondent's assessment of a deficiency for the taxable year 1972 is barred by the Statute of Limitations. The general rule under section 6501(a) is that assessment of tax must be made within three years after the return is filed. In the instant case, since the statutory notice of deficiency was issued on April 8, 1977, assessment for the taxable year 1972 is barred unless section 6501(e)(1) applies. Section 6501(e)(1) [3] states that if the taxpayer omits from gross income an amount which is in excess of 25 percent of the amount of gross income stated in the return, then the tax may be assessed within 6 years after the return was filed. The burden of proof is upon respondent to show that petitioner omitted more than *669 25 percent of gross income. Peters v. Commissioner, 51 T.C. 226, 230 (1968). In the taxable year 1972, petitioner reported gross income of $ 15,093.65, $ 650, and $ 21.01 from wages, rent, and interest, respectively. Therefore, in order to carry his burden, respondent must show that petitioner *670 omitted more than $ 3,941.17 from her return for the taxable year 1972. Since respondent has determined that the unreported bank deposits were attributable to the purchase and sale of antiques by petitioner, he also must show that this activity was the likely source of the omitted income. If section 6501(e)(1)(A)(i), which provides that in the case of a trade or business "gross income" means the total amounts received from the sale of goods without reduction for the cost of such sales, is to apply, respondent must also show that petitioner was in the trade or business of selling antiques. The record shows that petitioner was extensively involved in the purchase and sale of antiques during the taxable year 1972. The manager of the Godfrey Antique and Coin Show testified that petitioner rented space for nine shows held in 1972 and petitioner added that she had also attended a tenth show during that year. Petitioner also rented space in two separate flea markets held at the Berkeley Knights of Columbus Hall. The parties stipulated that at an auction held for her by the Stumpf Auction Co. she received gross proceeds in the amount of $ 2,474.50 in early 1972. In addition, petitioner's *671 purchases of antiques totaled $ 11,102 in 1972 and petitioner testified that she generally purchased more antiques than she sold. Based on the above-stated facts, we are convinced that the increase in deposits of $ 10,093.13 in 1972 was due to petitioner's sale of antiques and that petitioner was in the trade or business of selling antiques. We also determined above that petitioner's cost of goods sold for 1972 amounted to $ 5,551. Therefore, petitioner omitted more than 25 percent of the amount of gross income stated in her return. Accordingly, the six-year Statute of Limitations applies and respondent's assessment for the taxable year 1972 on April 8, 1977, was timely. The only remaining issue is whether petitioner is liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations for each of the years here in issue. When respondent determines an addition to tax for negligence, the burden is upon petitioner to show that the determination was in error. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974). The only records petitioner has produced which were prepared during the taxable year 1972 were copies of *672 the Illinois Retailers' Occupational Tax Returns. When asked by respondent's agents concerning her books and records, petitioner replied that she did not keep any records nor was she required to do so. Based on the evidence presented at trial, petitioner has not shown respondent's determination of an addition to tax for negligence under section 6653(a) to be in error and we therefore sustain that determination. Decision will be entered under Rule 155. was she required to do so. Based on the evidence presented at trial, petitioner has not shown respondent's determination of an addition to tax for negligence under section 6653(a) to be in error and we therefore sustain that determination. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.↩
2. The following shows the deposits which respondent either determined in his notice of deficiency or conceded at trial were deductible from total deposits for the years in issue: 1972
1973
1974
Paychecks: The L.E. Myers Co.
$ 7,002.11
$ 809.92
Wegman Electic Co.
845.18
Sachs Electric Company
$ 1,808.57
N.G. Gilbert Corporation
1,919.36
Donovan Construction Company
610.46
1,892.94
R. Dron Electrical Co., Inc.
539.92
Power Constructors
590.32
IBEW No. 2 - NECA Vacation
and Holiday Fund
500.00
289.21
Rent
360.00
Loans
4,634.64
3,754.49
1,705.00
Bonds
188.70
Church
10.00
15.00
Transfers from savings acct.
to checking acct.
4,546.00
1,800.23
5,271.75
Unemployment checks
230.00
82.00
State Dept. of Revenue
19.40
Federal income tax refund
720.00
900.00
1,066.87
TOTAL
$ 18,806.63
$ 11,057.51
$ 12,247.93
This would leave gross receipts from sales of antiques of $ 10,093.13, $ 14,088.19, and $ 17,310.97 for the years 1972, 1973, and 1974, respectively, rather than the amounts determined in the notice of deficiency.↩
3. Sec. 6501(e)(1) provides, in pertinent part, as follows: (e) Substantial Omission of Items.--Except as otherwise provided in subsection (c)-- (1) Income taxes.--In the case of any tax imposed by subtitle A-- (A) General rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; * * *↩