FARHIN SANAI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; FADEL NORMAN FADEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sanai v. Commissioner
Docket Nos. 2012-86, 2213-86
United States Tax Court
T.C. Memo 1990-504; 1990 Tax Ct. Memo LEXIS 557; 60 T.C.M. (CCH) 846; T.C.M. (RIA) 90504; September 24, 1990, Filed *557 Decisions will be entered under Rule 155. Michael Artan, for the petitioners. Fera M. Wagner, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Sec.
Sec.
Docket No.
Year
Deficiency
6653(b)
6654(a)
2012-86
1981
$ 5,068,015
$ 2,534,007
--
Sanai
2213-86
1981
4,971,533
2,485,766
$ 381,268
Fadel
*558 Respondent has conceded that petitioners are not liable for the section 6653(b) additions to tax. Respondent determined, in the alternative, additions to tax under section 6653(a)(1) and (a)(2). Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the year in issue. The issues for decision are whether petitioners had unreported income in 1981 and whether petitioners are liable for the section 6653(a)(1) and (a)(2) additions to tax. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Petitioners Farhin Sanai (Sanai) and Fadel Norman Fadel (Fadel) were residents of California at the time the petitions in these cases were filed. Sanai and Fadel were married in 1974. In August 1980, a decree of annulment of the marriage was rendered by the Superior Court of the State of California for the County of Los Angeles. Sanai was born in Iran and came to the United States in 1968. Her father lived in Iran and was engaged in manufacturing Persian rugs and real estate and was a representative for Mercedes-Benz of Iran until *559 his death in 1979. Her father owned several properties in Tehran, an orchard in Mehran, an orchard on the Caspian Sea, and a residence in Iran with 14 bedrooms. In 1979, Sanai went to Iran to attend to her father's estate. She stayed in Iran for approximately 6 months. The terms of Sanai's father's will provided that all of his real property was to be divided among his wife and four children. Specifically, his will provided: EXECUTIONS: a. - I grant (Bequeath) the residential house at AVENUE SABA, after demise of my wife [beneficiary not specified]. b. - I grant (Bequeath) the Orchard at North at the Beach of Caspian Sea to my two daughters FARHIN AND SOROUSH to be shared equally. c. - I grant (Bequeath) the Mehran Orchard located at Seyed Khandan to Farhin. Since Farhin has helped greatly in keeping those properties they are her right to have them and others shall have shares in other real properties. d. - I grant (Bequeath) all the shops of the Elizabeth Passage (Arcade) located at Elizabeth Boulevard to FARHIN and other survivors of mine have no right in those subject properties. e. - All my debts are against Formal Documents, *560 which should be paid through the sale of some of the properties. Also the tax and the debts that I owe to the people (and their list along other documents are held by my wife) should be paid off through the sale of Apartments of Jamshid Abad and whatever remains should be given to SOROUSH. f. - All the cash, jewelry, gold and valuable items and objects which are at the residential house or at other places and in local and foreign banks and my dues (whose list is held by my wife) shall be divided in proportion of one to four between my two daughters SOROUSH AND FARHIN. In 1980, Sanai returned to Iran for approximately 9 months in order to arrange for the transfer of her inheritance from Iran to the United States. At that time, it was difficult to transfer assets out of Iran due to the outbreak of the Iran-Iraq war. Sanai contacted an attorney, Mehdi Mirnia (Mirnia), to help her sell the properties she inherited from her father and to get the proceeds from the sale out of Iran. An active "black market" consisted of merchants who would transfer assets out of Iran for a fee. Mirnia agreed with Sanai that Sanai would only pay for the expenses incurred in transferring her money *561 out of Iran, not the black market fee, in exchange for her being a conduit for Mirnia to transfer other persons' funds out of Iran. Mirnia and Hamid Abbassi (Abbassi) were principals in Saphiran Company (Saphiran) in Iran. They instructed petitioners on how to transfer funds out of Iran. During 1981, trade between the United States and Iran was prohibited. The transfers were therefore made through banks in Canada. Saphiran would arrange for letters of credit to be sent from banks in Iran to the Royal Bank of Canada, and, upon receipt of the letter of credit, the Royal Bank of Canada would release the funds to General Commodity, B.C., Ltd. (General Commodity), a company formed by Fadel. The funds were released to General Commodity, upon presentation of false documentary evidence that large chemical shipments were taking place. The documents, including bills of lading, freight bills, and certificates of origin were prepared by a secretary at Seven Air Cargo. From June until September 1981, 14 or 15 such transactions took place. On those 14 or 15 occasions in 1981, Fadel took the false documentation to the Royal Bank of Canada in Vancouver, Canada. The bank approved the documents, *562 sent a copy of the documents to a bank in Iran, and released the funds into Royal Bank of Canada accounts held by petitioners. The funds were thereafter transferred to accounts held by Sanai in United States banks. In reality, no merchandise was exchanged. Petitioners used 14 separate letters of credit to deposit $ 15,046,508.26 into General Commodity's Royal Bank of Canada account number 402-690-2. In 1981, $ 6,256,788 was transferred from that account to General Commodity's account number 12010-00172 at Bank of America. In 1981, petitioners received at least $ 6,309,818 as conduits for the transfer of funds from Iran to the United States. The amounts were transferred to other persons through Sanai's bank accounts by her personal check or a cashier's check in separate transactions between June 30, 1981, and November 25, 1981, in amounts ranging from $ 500 to $ 1,300,000. During 1981, petitioners deposited funds in three accounts at Bank of America as follows: Account Name
Account Number
Amount Deposited
Farhin Sanai
0784-4-00282
$       2,903.87
Peacock Throne
1201-3-03711
48,727.62
Farhin Sanai
0392-5-00930
162,658.01
Farhin Sanai
0592-3-03690
263,142.16
Farhin Sanai
1201-8-01403
104,096,615.26
*563 Peacock Throne was a retail dress store operated by Sanai. On July 15, August 1, and September 14, 1981, Sanai purchased three condominium units in Warner Center, Woodland Hills, California, at a total cost of $ 455,000. On September 15, 1981, petitioners purchased a house in Calabasas, California, for $ 700,000. During 1981, petitioners also owned other real property located in Woodland Hills, California. In 1981, Sanai purchased three cars: (1) a Mercedes-Benz 380SL for $ 42,000; (2) a Mercedes-Benz 380SLC for $ 52,000; and (3) a BMW for $ 38,000. On October 12, 1981, Sanai placed $ 1,500,000 in the Inter Capital Liquid Asset Fund (Inter Capital Fund) at Dean Witter Reynolds, Inc. During 1981, Sanai earned $ 45,621 in dividends from that fund. In 1981, Sanai incurred the following personal expenses: Amount
Description
$ 750,000
Check cashed for herself.
20,030
Check for her son to pay
loan he incurred. 100,500
Check given to her son for
purchase of a condominium unit. $ 870,530
Sanai informed her accountant, Robert Faller (Faller), about the money she received as a conduit and about her inheritance. Faller advised her that *564 the inheritance was not taxable and that she acquired a carryover basis in her inherited assets. Faller further advised Sanai that the money transfers she performed for other Iranians were also not taxable. On her 1981 Federal income tax return, Schedule C, Sanai claimed an investment loss of $ 310,000. On her Schedule C for Peacock Throne, Sanai reported cost of goods sold of $ 44,971. Sanai reported interest income of $ 119,415. Included in that amount is $ 45,621 of dividend income received from the Inter Capital Fund. Fadel did not file a 1981 Federal income tax return. OPINION Petitioners bear the burden of proof with respect to the issues in this case. Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. Rule 142(a), Tax Court Rules of Practice and Procedure. In the notices of deficiency, respondent determined, among other things, that petitioners had unreported income reflected in bank deposits of $ 14,189,924 in 1981, which respondent allocated equally between petitioners as community property. Respondent further determined that Sanai was not entitled to her claimed cost of goods sold deduction *565 in the amount of $ 13,447 or the loss on investment of $ 310,000. Sanai offered no evidence with respect to the cost of goods sold deduction and is deemed to have conceded that amount. Sanai's accountant, Faller, testified that he understood the $ 310,000 loss on investment to be a bad debt. No other evidence, however, was presented with respect to that amount to show that the debt was created or acquired in Sanai's trade or business or that it became worthless. Sec. 166. Sanai has not met her burden of proof on that issue. Unreported Income
Respondent now concedes that $ 1,875,116 of the $ 14,189,924 he determined was deposited in petitioner's bank accounts represents nontaxable funds transferred by petitioners as conduits from Iran to the United States (conduit funds). Respondent also concedes that $ 3,500,000 of the initial unreported income amount represents inheritance proceeds. Petitioners contend that they did not have unreported income but rather that all of those funds in dispute represent (1) an inheritance from Sanai's father nontaxable under section 102(a) or (2) conduit funds. Petitioners' explanations were plausible, uncontradicted, and unimpeached, *566 and there was no indication that their testimony was fabricated. The testimony was detailed and corroborated by documents and by other witnesses. In a comparable situation in Diaz v. Commissioner, 58 T.C. 560, 564-565 (1972), we stated: This case epitomizes the ultimate task of a trier of the facts -- the distillation of truth from falsehood which is the daily grist of judicial life. * * * * * * In the final analysis, our decision herein rests upon our evaluation of the entire record and the credibility of the witnesses who appeared before us. * * *
We are satisfied from petitioners' testimony that they did not have unreported income from sales of chemicals or other goods overseas, as contended by respondent. Our acceptance of the testimony as generally credible, however, does not require that we accept petitioners' assertions that none of the unexplained deposits represent taxable income. Concepts of inherited property, stepped up basis, and gains on disposition of such property are complicated, and petitioners have not explained or analyzed the disposition of assets in a manner that negates gain. They merely assert that, under the conditions existing *567 in Iran, it was not possible to have profited from sales of Sanai's inherited assets. There is no expert testimony or any other evidence supporting petitioners' general assertion. It is not unlikely that profits were made in their dealings in the property of Sanai and others. Petitioners admit in their brief that interest was earned on the inherited funds. Income on inherited property is taxable. See section 102(b). Bank deposits are prima facie evidence of income, and petitioners must prove that the deposits are not income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Under these circumstances, we must make the best approximation that we can, weighing heavily against petitioners because the inexactitude is of their own making. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Respondent has conceded that $ 3,500,000 of the amount initially determined to be unreported income represents proceeds from Sanai's inheritance. Respondent now contends that petitioners had unreported income of $ 9,389,326 *568 in 1981. Respondent's brief contains several calculations, some of which are inconsistent with the stipulation of facts and contradicted by the evidence. We conclude that the amount of unreported income remaining in dispute is $ 8,814,808, representing the amount determined in the notices of deficiency less the amounts conceded by respondent as inheritance and conduit funds. We have examined respondent's personal expenditure analysis, net worth analysis, and bank deposits analysis. Conceptual errors in them render them unreliable. For example, respondent's analysis of source and application of funds does not give credit for amounts on hand as of the beginning of the year and assumes, without justification, that all expenditures were made from funds received during 1981. Respondent's net worth analysis relies on a financial statement dated April 9, 1982, but representing a period ended October 31, 1982. Respondent adds total expenditures during 1981 testified to by Sanai to net worth as of October 31, 1981, without eliminating any possible duplications. Respondent's bank deposits analysis is based on an interpretation of records that have not been explained and are not self-explanatory. *569 We have examined the cancelled checks and copies of checks submitted by petitioners as evidence of conduit payments, which totalled $ 6,309,818. Sanai testified that she paid approximately $ 5,000,000 to a person named Cohan and $ 4,500,000 to a person named Afshar. Amounts paid to these persons represented by checks are $ 2,902,000 and $ 55,000, respectively. Our best approximation based on the evidence is that petitioners are entitled to treat $ 8 million as funds for which they served as conduits. That amount, as well as $ 3.5 million conceded by respondent to be inherited, is not taxable. Petitioners have failed to prove that the remaining bank deposits are not unreported income. Respondent determined that the unreported income was community income and allocated it to Fadel and to Sanai. Petitioners contend that they were not married during 1981, because they had secured an annulment. Respondent contends that the annulment was a sham and that, in any event, petitioners were partners with respect to the income. We are not prepared to disregard an annulment obtained for nontax purposes and of record under the laws of the State having jurisdiction over the marriage of petitioners. *570 Under the circumstances as we see them, however, the validity of the annulment is not decisive. Property acquired by inheritance and the profits on such property are separate property of the spouse receiving the inheritance, in this case Sanai, under California law. Cal. Civ. Code sec. 5107 (Deering 1990). To the extent that we have concluded that petitioners had gains during the year, the most logical inference from the evidence is that those gains resulted from dealing in Sanai's inherited property and engaging in an activity related to that inheritance. Fadel acted as her agent, but the funds were deposited into accounts in Sanai's name. We are not persuaded that petitioners acted as partners, and we conclude that the income was separate property of Sanai. As a consequence, none of the income is taxable to Fadel, but Sanai's income will be computed by reducing total bank deposits by the amounts determined to be nontaxable or previously reported. Section 6653(a) Additions to Tax
Section 6653(a)(1), for the year in issue, provides for an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard *571 of the rules or regulations. Section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest due on the underpayment attributable to negligence. For the purposes of section 6653(a), negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Generally, the addition to tax for negligence is not imposed where a taxpayer's deductions are taken in good faith and based on advice of a competent tax expert. Otis v. Commissioner, 73 T.C. 671, 675 (1980), affd. without published opinion 665 F.2d 1053 (9th Cir. 1981). Petitioners argue that they were not negligent because Sanai relied on her accountant, Faller. Faller testified: Q You gave her [Sanai] advice regarding money that she told you she inherited, correct? A Correct. Q And with respect to the tax consequences of that money, what advice did you give her? A I told her it was zero. Q You told her what was zero? A That -- First of all, inheritance tax, to my understanding, would be paid by the estate. And -- Q Do *572 you mean her tax liability would have been zero? A Yes. Q Okay. And with respect to the monetary transactions she described for you -- Did you tell her at any time that there was any tax due or owing, with respect to transactions of that nature? A No. I advised her that there is no tax due on that. Let me -- I never told her there would be tax. I mean, it was just implied there was no tax. Faller further testified that Sanai communicated with him on several occasions regarding the taxability of the transfer of funds. We are persuaded on the evidence that the addition to tax for negligence is not justified in this case. Sanai sought the advice of an accountant and relied on that advice. If petitioners had maintained better records of the transactions, they might have proven that they owed less income tax. Under the circumstances, however, the minimal records and the belief that records were not required are explained. To take account of respondent's concessions and our conclusions, Decisions will be entered under Rule 155.