T.C. Memo. 1995-514


UNITED STATES TAX COURT


DONALD FERRY AND SHARON FERRY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25901-92.               Filed October 30, 1995.


Donald Ferry and Sharon Ferry, pro sese.

<u>Douglas A. Fendrick</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  Respondent determined deficiencies in and
additions to petitioners' Federal income taxes as follows:

| | | Additions to Tax | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6653(b)</u> | <u>6653(b)(1)(A)</u> | <u>6653(b)(1)(B)</u> | <u>6661</u> |
| 1987 | $38,956 | -- | $28,777 | [1] | $9,593 |
| 1988 | 33,831 | $24,779 | -- | -- | 8,259 |

¹ 50 percent of the interest due on the amount of the underpayment attributable solely to fraud.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

The issues for decision are:  (1) Whether petitioners underreported their taxable income for the year 1987 in the amount of $130,232; (2) whether petitioners underreported their taxable income for the year 1988 in the amount of $85,231; (3) whether the above-mentioned understatements of income for 1987 and 1988 were attributable to fraud by Donald Ferry (petitioner); and (4) whether petitioners are liable for an addition to tax under section 6661 for 1987 and 1988.  Respondent has conceded that Sharon Ferry is not liable for the fraud addition.

FINDINGS OF FACT

Preliminary Matters

The stipulated facts and exhibits are incorporated by this reference.

When the petition in this case was filed, petitioners resided in Newark, Delaware.  Petitioners are husband and wife and filed joint Federal income tax returns for the years in issue.

On their joint Federal income tax return for 1987, petitioners reported total income of $6,920 consisting of wages

of $4,180.69, interest income of $206.31, and unemployment income of $2,533. They claimed a child care credit of $81 and showed a tax liability of zero. They also claimed (and apparently received as a refund) an earned income credit in the amount of $851. Petitioners claimed two children as dependents, Sean D. Ferry and Brent R. Ferry. On line 6(c)(3), requesting the children's Social Security numbers, petitioners stated, "applied for".

On their joint Federal income tax return for 1988 petitioners reported wages of $5,665.10, interest of $63.80, and unemployment income of $4,920 for a total of $10,648.90. They claimed and received as a refund an earned income credit of $793. Again, they listed the children as dependents and showed their Social Security numbers as "applied for".

Forms W-2 were attached to the returns. The Forms W-2 for Donald D. Ferry showed wages from Wayanne, 1108 South College Avenue, Newark, Delaware 19713, in the amount of $3,910.69 in 1987 and $5,665.10 in 1988. These forms were prepared by petitioner himself, not by Wayanne's normal payroll preparer, and petitioner's business associate, Wayne Wilberding, was not aware of them.

Using a combination of the bank deposits and specific items methods, respondent originally determined that petitioners understated their income for 1987 by $130,232 and for 1988 in the

amount of $124,879.  Prior to trial, respondent conceded $39,648 of the adjustment for 1988.  Thus, respondent now claims petitioners' income for 1988 was understated in the amount of $85,231.

Respondent determined that petitioners failed to report the following amounts of bank deposits as income for the taxable year 1987:

| | | |
|---|---|---|
| I.H.R-L LTD bank account | $103,514 | |
| Ferry Associates bank account | 22,503 | |
| | | $126,017 |
| plus | | |
| Personal expenses paid from | | |
| MIT LTD bank account | 8,126 | |
| Less W-2 reported income from | | |
| Wayanne, Inc. | (3,911) | |
| Difference | | 4,215 |
| 1987 understatement | | 130,232 |

Respondent determined an understatement based on bank deposits in 1988 as follows:

| | | |
|---|---|---|
| I.H.R-L LTD bank account | $47,458 | |
| Ferry Associates bank account | 12,175 | |
| R.E.P., LTD bank account | 24,290 | |
| | | $83,923 |
| plus | | |
| Personal expenses paid from | | |
| MIT LTD bank account | | 1,308 |
| 1988 understatement | | [1]85,231 |

[1] Apparently, respondent's concession for 1988 described above takes into account the Form W-2 wages reported from Wayanne, Inc.

Petitioner's theory is that it was not his money.  He posits several possibilities:  It was Wayanne's money, already taxed.  Or it was a "pass-through" among various entities.  Or it was his father's or his children's money (which petitioner was holding or investing for them).  Or the money came from gifts or loans from his parents.  Or it was the repayment (without his business associate's knowledge) of "loans" petitioner had made to the business.  Or it was the movement of funds left over from the settlement of a lawsuit in 1983.

Family Relations

Sharon Ferry attended St. Joseph's College and Duquesne University and has a degree in nursing.  She took a nursing refresher course in 1988.  Aside from the Form W-2 income of $270 reported in 1987, she was employed only as a babysitter for 3 hours per week at $5 per hour during the years in issue.

Since 1982, petitioners have lived at 404 Arbour Drive, Newark, Delaware.  Sharon Ferry's maiden name is Rowan.  She has two brothers, William and David.  Neither brother ever mentioned to Mrs. Ferry that he was the owner of the house where petitioners reside.

During 1987, petitioners' sons were ages 13 and 9.  They attended Holy Angels parochial school.

During the years in issue, petitioners had only one telephone line in their house.  Although this number was listed

under R.E. Plus, it was petitioners' personal and only telephone number.

Petitioner's parents were working-class people. His mother did not work outside the home. Mrs. Ferry never saw petitioner's parents give petitioners a gift by cash or check. Petitioner's father died in 1989. At time of trial, his mother was in a nursing home. Petitioner has at least one sister.

In 1987 and 1988, Sharon Ferry had the following credit cards: Visa, Mastercard, Strawbridge, J.C. Penney, Macy's, and Sears. Although the accounts were in Mrs. Ferry's name, petitioner possessed cards with his name on them, which he used. Sharon Ferry kept a checkbook, which she considered a joint account, in the name of Ferry Associates. The couple had no personal joint account in their own names.

The Iron Hill Restaurant

Petitioner was involved in a restaurant known as the Iron Hill Restaurant and Lounge (Iron Hill). As is true of much of this case, the nature of petitioner's involvement is unclear. The legal form of any entity or entities connected with Iron Hill is also unclear. We do the best we can, given the state of the record.

Iron Hill opened in 1971 or 1972. Wayne Wilberding was then the owner and president of Wayanne, Inc. (Wayanne), trading as the Iron Hill Inn Restaurant. Wilberding met petitioner in 1981,

when petitioner approached him about investing in the restaurant. Iron Hill was in arrears with State and Federal taxes. It was also facing a balloon payment on a mortgage taken out in 1977.

Petitioner convinced Wilberding that he had financial and business expertise, and outlined a plan to pay off the taxes and the prime lease. Petitioner would pay Wayanne's debts; in return, Wayanne would be dissolved and petitioner would become a 50-percent partner in everything connected with the restaurant, including the 40-year lease and leasehold improvements. Petitioner paid approximately $47,000 to the Internal Revenue Service (IRS) in August of 1982 for Wayanne's withholding taxes, and $25,000 to the State of Delaware.

At trial, petitioner claimed these amounts were loans to Wayanne, that he is thus a creditor, and therefore any moneys he took out of the business (which he denies having done) were simply loan repayments and not taxable income to himself. Wilberding contends that petitioner was buying a 50-percent partnership share of the business. Neither a partnership agreement nor notes evidencing loans are in evidence. Nor are there any stock agreements or shares or, in fact, anything showing that any of the entities referred to in this case had any legal existence.

Petitioner claimed that he created or used various entities for various aspects of the business. One entity was to buy

furniture; another to buy the leasehold. Petitioner told Wilberding that these were all flow-throughs and that this was the way to get tax savings.[1]

Petitioner began working at the restaurant in the early 1980's. He worked there 6 to 8 hours per day during the years in issue, but neither he nor Wilberding was on the payroll. Petitioner kept the books, counted the receipts, made the deposits at the bank, and handled tax and other financial matters. Petitioner told people he was the "business manager" or "business manager for the creditors". Wilberding handled the day-to-day operations, such as hiring and scheduling employees, cooking, and waiting tables.

At various times, petitioner held himself out as owner of the building in which the restaurant was located, as a creditor, as a shareholder of Wayanne before the years in issue (claiming in testimony that he sold his interest to his father in 1986, which he described as the sale of stock), as an employee (in

---

[1] The IRS agent testified that she located 14 corporations, 13 partnerships, and 3 trusts related to petitioner. Although petitioner objected that some of them were not his, it is obvious from a cursory glance at Exhibit AL that many were mentioned by petitioner himself during the trial, and others seem clearly related by the names (such as (Don) Ferry Family Trust, Inc., Ferry Family Trust, Don Ferry Limited Trust, Restaurant Equipment & Property Ltd - D. Ferry Ltd. Trust, Gen. Ptr.).

Forms W-2), and as a partner (signing a partnership return as "general partner").[2]

Wilberding considered petitioner to be his 50-percent partner. Wilberding believed that Wayanne was dissolved in 1983 or 1984, at which time he and petitioner became partners in all the various entities petitioner had created. At that time some bank accounts were closed, and other bank accounts were set up for various aspects of the business. For instance, a payroll account under the name of "Wayanne, Inc." was changed to "Wayanne Ltd." The name of the restaurant was changed to Iron Hill Restaurant, Ltd.

In 1989 Wilberding and petitioner parted ways, and Wilberding sued petitioner for an accounting. The dispute was precipitated by a letter from the IRS saying that Wayanne was being audited.[3] Wilberding discovered his name was on purported returns which he had not signed, and he asked petitioner for an

---

[2] Petitioner testified in a previous trial that his sons owned an interest in Iron Hill Investments, Inc., but sold their interest in December 1988, when the children would have been 14 and 10 years of age.

[3] It is unclear what years were under audit, whether returns had been filed for those years and, if so, whether they were corporate or partnership returns. It is clear that petitioner told the IRS agent that he had a power of attorney for the business. Petitioner had removed the records from the restaurant premises, and met with the revenue agent, giving her permission to take the records for copying. She later returned them to Wilberding. Despite some tangential testimony about the restaurant audit, those returns are not in evidence and appear to have little or no relevance to this case.

accounting. On July 23 or 24, when Wilberding's wife went in to open the restaurant, all the cash registers were gone, the phones were gone, and the door was padlocked. Petitioner claimed that other creditors were about to seize the restaurant's assets, and he had moved first to "protect his father's investment". There is no documentary evidence or credible testimony to what extent, if any, petitioner's father had an interest in the business.

Based on all the evidence in the record, we hold that the amounts paid by petitioner on behalf of Wayanne and its progeny were investments, not loans.

The Partnership Return

Petitioner prepared the 1986 Form 1065 Federal partnership income tax return for the restaurant and signed the return as a general partner. This return was filed for the tax year ended June 30, 1987. The return is filed in the name of Iron Hill Restaurant-Lounge Ltd., employee identification number (EIN) 51-0290454, c/o 404 Arbour Drive, Newark, Delaware 19713 (petitioner's home address). It states the business started February 1, 1986. It states that there are two partners in the partnership, and that it is not a limited partnership. The partnership reported $1,011.39 ordinary income.

However, a Schedule K-l (Partner's Share of Income, Credits, Deductions, etc.) is attached, which conflicts with and contradicts the Form 1065. The Schedule K-1 lists the partner's

name and address as Iron Hill Restaurant-Lounge Inc., 1108 S. College Ave., Newark, Delaware 19713 (the restaurant's location). The partner's EIN is shown as 23-2353924. However, the partnership's name and address on the Schedule K-1 is I.H.R.L., Ltd., c/o 404 Arbour Dr., Newark, Delaware., with the EIN previously given for Iron Hill Restaurant-Lounge Ltd. on the Form 1065. The Schedule K-1 indicates that the partner (Iron Hill Restaurant-Lounge, Inc.) is not a general partner, that it is a corporation, and that the partner's percentage of profit and loss is "100%". The Schedule K-1 thus shows the partner's distributive share of ordinary income as $1,011.39.

Respondent's records show no returns filed for 1987 or 1988 for Iron Hill under either of the two EIN's shown on the partnership return: 51-0290454 or 23-2353924. We find that no such returns were filed for 1987 or 1988. Nor were income tax returns filed from 1980 through the years in issue for R.E.P., Ltd., Real Estate Plus, or Ferry Associates.

MIT LTD Bank Account

Iron Hill funds were deposited in two bank accounts: MIT, Ltd., and Wayanne, Ltd.[4] The Wayanne account was used for payroll, and is not here relevant. The restaurant proceeds not

---

[4] At one point some restaurant proceeds were also deposited in an account in the name of R.E.P. at First Federal, but that was closed in or before 1985. The R.E.P. account at issue here was located at Second National Federal Savings Bank.

allocated to payroll went into an account at Delaware Savings and Loan Association in the name of "D. Ferry or W. Wilberding - MIT Ltd".[5]  The account was used for food purchases, car purchases, and other purchases and supplies used in the course of the restaurant's business.  Both petitioner and Wilberding signed the card, dated January 16, 1985.  Although the address on the signature card is that of the restaurant, during the years in issue, bank statements were mailed to petitioner's residence. The EIN shown on the MIT account statement is 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.

Neither petitioner nor Wilberding was paid a salary for his work at Iron Hill.  However, it was petitioner's idea to pay many of his own and Wilberding's personal expenses from the MIT account, and this was done.

In 1987, petitioners' personal expenses in the amount of $8,126 were paid from the MIT account; in 1988, $1,278 was paid. Checks were written from this account for petitioners' personal benefit, to Holy Angels parochial school (which petitioners' children attended); to Macy's, J.C. Penney, and Strawbridge for credit card purchases; to Wilmington Trust for car payments; to First Federal Savings and Loan for petitioners' home mortgage

---

[5]  MIT stands for Mortgage Investors Trust, which in a prior lawsuit petitioner admitted was himself.

payments; and for petitioners' residential utilities and telephone bills.[6]

Ferry Associates

In 1984, petitioner opened a bank account at Delaware Savings and Loan Association in the name of "Ferry Associates". Petitioner listed his home address as the business address of Ferry Associates, and monthly bank statements were sent to his home. He represented to the bank that he was the owner of Ferry Associates.

The account was opened under the Social Security number (but not the name) of petitioners' son, Sean Ferry. In 1984, petitioners' sons were 10 and 6 years old.

Petitioners, along with petitioner's parents, had check-signing authority for this account and, in fact, used it as their

---

[6] Specifically, we find that petitioners were the owners of a 1985 Mercury Marquis financed through Wilmington Trust Co. Petitioner's father was not the owner. Petitioners bought the car, drove it, obtained insurance for it, and kept it at their house. Thus, payments to Wilmington Trust in the amount of $2,250 are income to petitioners.

We also find that petitioners were the beneficial owners of their residence at 404 Arbour Dr., Newark, Del., where they have lived since 1982. Specifically, we find that the house was not owned by petitioner's brother-in-law, David Rowan, by "Investments Plus, Inc." or by "Iron Hill Investments, Inc." or by any other entity. Thus, mortgage and tax payments made to First Federal Savings and Loan totaling $3,249.44, from checks drawn on the MIT account, were for petitioners' personal expenses and are income to petitioners, as are payments of telephone and utility bills at that address.

personal checkbook.[7]  In fact, Mrs. Ferry testified under the assumption that this was their personal, joint bank account.

Petitioners deposited $22,503 into the account in 1987 and $12,175 in 1988.  The account was not supposed to contain any proceeds from the Iron Hill or Wayanne.

I.H.R-L Bank Account

In 1985, petitioner opened a checking account at Second National Federal Savings Bank in the name of I.H.R-L LTD (IHRL). Although I.H.R-L is an abbreviation for Iron Hill Restaurant-Lounge, restaurant funds were not supposed to be deposited in this account, but in the MIT account.  Wilberding did not have signature authority on the IHRL account--in fact, he did not know it existed.  Petitioners' home telephone number and home address were listed on the IHRL account, and monthly bank statements were sent there.  Petitioner made deposits and had sole check-signing authority.

Petitioner deposited $103,514 into the account in 1987 and $47,458 in 1988.   No one but petitioner used this account.

R.E.P., Ltd.

In February 1988, petitioner opened a checking account at Second National Federal Savings Bank in the name of R.E.P., Ltd. (REP).  Petitioner listed his home telephone number and home

---

[7]  There is no evidence that petitioner's parents used the account or, indeed, even knew of it.

address on the account, and monthly bank statements were sent to him there.  Petitioner had sole check-signing authority.

During 1988 petitioners deposited $56,224 into the account. No proceeds from the Iron Hill or Wayanne were supposed to have gone into this account.

REP may stand for Real Estate Plus.[8]  Petitioner was the actual and beneficial owner of R.E.P., LTD.  Throughout 1987 and 1988, petitioners' home utility bills were in the name of R.E. Plus.  This was simply another name for petitioner.

We find and hold that petitioners had unreported income of $130,232 for 1987 and $85,231 for 1988.

Petitioner did not cooperate during the audit.  Although requested to do so, he did not turn over any personal records to respondent.  He refused to pick up certified mail from the post office.  Moreover, he made false statements to respondent's agent, Joanne Griffin.  He claimed he had no bank accounts, no credit cards, and no financial interest in any business during 1987 and 1988.

OPINION

The theme of this case could well be: "Oh, what a tangled web we weave when first we practice to deceive."[9]  To that end,

---

[8] REP may also stand for "Restaurant Equipment Properties".

[9] Sir Walter Scott, "Marmion", canto VI, st. XVII (Little Brown & Co. 1857).

petitioner created or participated in numerous entities, bank accounts, transactions among purported partners and shareholders, and other purported arrangements (such as loans, leases, flow-throughs), many of which were fictitious, creating layers of complexity which appear to have served little or no function other than an attempt to deceive respondent. Indeed, the web woven by petitioner is so tangled as to be virtually impenetrable.

Additions for Fraud

Respondent determined in the notice of deficiency that petitioner is liable for the additions to tax for fraud under section 6653(b)(1)(A) and (B) for 1987 and section 6653(b) for 1988. Respondent bears the burden of proof and must establish each element of fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), affg. T.C. Memo. 1983-249; Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Wright v. Commissioner, 84 T.C. 636, 639 (1985). Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner, 225 F.2d 216, 220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954.

Respondent must prove by clear and convincing evidence that: (1) An underpayment of tax exists for each of the years in issue, and (2) that some part of the underpayment is due to fraud. Sec.

7454(a); Rule 142(b); <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 698-699 (1989); <u>Hebrank v. Commissioner</u>, 81 T.C. 640, 642 (1983); <u>Mosteller v. Commissioner</u>, T.C. Memo. 1986-505, affd. without published opinion 841 F.2d 1123 (4th Cir. 1988).

Respondent cannot meet her burden of establishing the existence of an underpayment on the basis of petitioner's failure to meet his burden of proving error in the determination of deficiencies. <u>Drieborg v. Commissioner</u>, <u>supra</u> at 218; <u>Parks v. Commissioner</u>, 94 T.C. 654, 660-661 (1990). However, respondent has amply met her burden.

Where a taxpayer fails to keep books and records sufficient to establish the amount of his or her tax liabilities, or if the records maintained do not clearly reflect income, then the Commissioner is authorized to reconstruct income by any method which, in her opinion, clearly reflects the taxpayer's income. Sec. 446; <u>Harbin v. Commissioner</u>, 40 T.C. 373, 377 (1963); sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner may use any reasonable method to compute the income, and no particular method is required. <u>Campbell v. Guetersloh</u>, 287 F.2d 878, 880 (5th Cir. 1961). The Commissioner's method need not be exact but must be reasonable. <u>Holland v. United States</u>, 348 U.S. 121 (1954); <u>Rowell v. Commissioner</u>, 884 F.2d 1085 (8th Cir. 1989), affg. T.C. Memo. 1988-410.

The use of the bank deposits method for computing income has long been sanctioned by the courts. <u>Estate of Mason v.</u>

Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Bank deposits are prima facie evidence of income. Estate of Hague v. Commissioner, 132 F.2d 775 (2d Cir. 1943), affg. a Memorandum Opinion of this Court. The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income, unless shown to derive from a nontaxable source. Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964).

Although requested, petitioner did not supply respondent with books and records showing sources of income. Petitioner told the agent that he and his wife had no bank accounts. Respondent's agent identified their bank accounts through third party information provided from summonses issued to banks in northern New Castle County, Delaware. Although the bank accounts included in respondent's analysis were not in petitioners' names, there was ample evidence to attribute them to petitioners.

All three bank accounts examined were opened by petitioner. He made the deposits in the accounts. On the IHRL and R.E.P., Ltd. accounts petitioner had sole check signing authority; on the Ferry Associates account this authority was shared with Mrs. Ferry and allegedly with petitioner's parents, although there is no evidence they used the account. Petitioners' home address was listed on the accounts, and monthly bank statements were sent there.

There is no credible evidence that the deposits were from nontaxable sources. We simply do not believe that the money came from gifts or loans from petitioner's father. Petitioner failed to call any family members (his mother, sister, or brother-in-law) in an effort to verify his stories. We thus infer that their testimony would have been unfavorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioner did not produce any evidence of so-called flow-throughs. Neither did he explain away the payment of his personal expenses (sometimes disguised in corporate names) out of the MIT account. Respondent has met her burden of showing the understatements of income for both years in issue.

Fraud is actual, intentional wrongdoing, and the intent is the specific purpose to evade a tax believed to be owing. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Respondent must show that petitioner intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of the tax. Stoltzfus v. United States, supra at 1004; Webb v. Commissioner, supra at 377.

Fraud is never to be presumed. Toussaint v. Commissioner, supra at 312; Webb v. Commissioner, 394 F.2d at 377. The existence of fraud is a question of fact to be determined on the

basis of the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud, however, can seldom be proved by direct proof of the taxpayer's intention.  Fraud can be established by circumstantial evidence and by reasonable inferences drawn from the taxpayer's entire course of conduct.  Spies v. United States, 317 U.S. 492, 499 (1943); Toussaint v. Commissioner, 743 F.2d at 312; Gajewski v. Commissioner, supra at 200.

Courts frequently list various factors or "badges of fraud" from which fraudulent intent may be inferred.  Recklitis v. Commissioner, 91 T.C. 874, 909 (1988).  Although such lists are nonexclusive, some of the factors this Court has considered as indicative of fraud are (1) understatement of income, (2) inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, and (5) failure to cooperate with the tax authorities.   Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992) (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601).  These indicia are amply present here, as set forth in the findings of fact.

The taxpayer's evasiveness on the stand, inconsistencies in his testimony, and the lack of credibility of such testimony are heavily weighted factors in considering the fraud issue. Toussaint v. Commissioner, supra at 312.  Petitioner was not credible.  His testimony was highly inconsistent concerning his

interest in the restaurant, the purpose of the transfer of funds to or on behalf of Wayanne, and interests purportedly owned by his sons and parents.  At one point he denied having created his own Forms W-2, but later said he intended thereby to reflect the personal expenses paid on his behalf from the MIT account.  He denied that he had charge accounts, but when confronted with evidence, admitted that he did have cards with his name on them, but said the accounts were in his wife's name.  He could not give the Court a straight answer to a simple question, such as "Why did you not have a personal bank account in your own name?"

Moreover, petitioner's testimony was flatly contradicted by Wilberding, an insurance agent (who testified that petitioner represented that the house and car were his), and a revenue agent.  Although Mrs. Ferry was evasive, clearly trying hard to avoid the twin pitfalls of perjury and contradicting her husband, she did not corroborate his testimony.  She said, for instance, unbelievably, that she did not know who owned her house ("You'll have to ask Don"), but admitted that she had no reason to believe her brother owned it.  She also testified that she had never seen any gifts from petitioner's parents.

It is well settled that we are not required to accept a taxpayer's self-serving testimony in the absence of corroborating evidence, particularly where the testimony is unreasonable, improbable, or questionable.  Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger

v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Niedringhaus v. Commissioner, supra at 212. Petitioner's testimony was unreasonable, improbable, and questionable, and we do not accept it.

The sophistication, education, and intelligence of the taxpayer are also relevant. Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949), affg. 7 T.C. 245 (1946); Niedringhaus v. Commissioner, supra. Although petitioner is not highly educated, he held himself out as a financial and business expert. He kept books and prepared individual, corporate, and partnership tax returns. He purported to set up trusts, corporations, and partnerships. He prepared Forms W-2 (at least, his own), and held himself out as the person with whom the revenue agent should deal in conducting the Wayanne audit. In testifying, he referred more than once to the gift tax limitation of $10,000 per year. We believe he was informed about taxes, and intended to evade them.

We have no doubt that petitioner intended to conceal his assets. The use of multiple entities with names and EIN's, use of his son's Social Security number on the Ferry Associates account (before stating for two consecutive years in issue that the children's numbers were "applied for"), putting his house, automobile, and telephone in other names, and the various other devices employed by petitioner convince us that he intended to conceal his assets.

In light of the above, we find that petitioner is liable for the additions to tax for fraud for each of the years in issue.

Substantial Understatement Under Section 6661(a)

Section 6661(a) provides that if there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year over the amount of the tax shown on the return. Woods v. Commissioner, 91 T.C. 88, 94 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6661(b)(1).

The amount of the understatement under this section shall be reduced if there was substantial authority for the tax treatment of the item by the taxpayer or if the relevant facts affecting the item are adequately disclosed on the return. Neither exception applies here. Therefore, we find that petitioners are liable for the addition to tax for substantial understatement.

To reflect a concession by respondent,

Decision will be entered

under Rule 155.