T.C. Memo. 2019-73

UNITED STATES TAX COURT

PHILIP N. ROSE AND LEANNA ROSE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21436-15.                                    Filed June 13, 2019.

<u>David C. Dodge</u>, for petitioner.

<u>Kimberly A. Trujillo</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In a notice of deficiency dated May 26, 2015, respondent

determined the following deficiencies and penalties:[1]

_____

[1] Unless otherwise indicated, all section references are to the Internal
Revenue Code of 1986, as amended and in effect for the years in issue.  Rule
references are to the Tax Court Rules of Practice and Procedure.  All monetary
(continued...)

[*2]

| Year | Deficiency | Penalty sec. 6662(a) | Addition to tax sec. 6651(a)(1) |
|------|-----------|----------------------|--------------------------------|
| 2009 | $60,226 | $11,802 | $3,159 |
| 2010 | 17,258 | 2,733 | --- |
| 2011 | 37,913 | 7,583 | 3,882 |
| 2012 | 26,930 | 4,786 | 1,469 |

After concessions,[2] the issues for decision are: (1) whether petitioners had unreported income of $7,877 for 2009, $31,578 for 2010, and $13,921 for 2012; (2) whether petitioners' real estate losses are limited by section 280A; (3) whether Ms. Rose qualified as a real estate professional for 2009 and 2010; (4) whether reported rental real estate losses should have been suspended until the disposition of the property in 2012; (5) whether petitioners were entitled to deductions for the years in issue for various expenses related to rental properties; (6) the character of

_____

[1](...continued) amounts are rounded to the nearest dollar.

[2] Petitioners conceded that they were not entitled to expense deductions for 2009, 2010, or 2011 claimed on Schedules C, Profit or Loss From Business; that they are not entitled to any pre-2009 capital loss carryover, net operating loss (NOL), or 2010 capital loss; that a truck sold in 2010 and a computer sold in 2012 were not business property; and that several determinations relating to the NOL and the character of income addressed infra were correct. Respondent conceded that certain items of income, discussed infra, are not taxable; and that petitioners substantiated certain of their expenses reported on Schedules E, Supplemental Income and Loss.

**[*3]** petitioners' business property loss in 2012; (7) whether petitioners are liable for additions to tax under section 6651(a)(1) for failure to file timely; and (8) whether petitioners are liable for accuracy-related penalties under section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference. Petitioners resided in Washington when they timely filed their petition. In 2009, the first year in issue, they had three children aged 3, 7, and 12 years old.

Mr. Rose is a commercial airline pilot who has flown for Northwest and Delta Airlines since 1998. He was also a member of the U.S. Air Force for 25 years before retiring in 2010 as a lieutenant colonel. During 2009 and 2010 he was stationed at Elmendorf Air Force Base in Anchorage, Alaska, and was deployed overseas for 45 days during 2009 as part of his active service. Ms. Rose stayed at home with petitioners' three children throughout 2009 until she became a part-time teacher working approximately 30 hours per week at the Anchorage Montessori School in August 2010.

**[*4]** I. <u>Petitioners' Real Estate Properties</u>

Petitioners' primary residence was in Goodyear, Arizona, from 2006 through October 5, 2008. They purchased their property in Arizona (Arizona property) on January 30, 2006, for $455,000. Petitioners moved their primary residence to Anchorage, Alaska, in 2008. They purchased their property in Alaska (Alaska property) on October 20, 2001, for $289,341. On July 29, 2011, petitioners moved their primary residence to Bothell, Washington. Petitioners also owned a property in Donnelly, Idaho (Idaho property), during the years at issue. They purchased the Idaho property on September 4, 2007, for $1,503,681.

A. <u>Arizona Property</u>

The Arizona property consists of land and a four-bedroom house with a two-car garage and a yard. Petitioners placed the Arizona property in service as a rental property on January 1, 2009. They had tenants for the Arizona property throughout 2009 and 2010 and for part of 2011. Petitioners engaged a management company to handle the day-to-day operations, including advertising the property to prospective tenants and making repairs to the property as needed. Petitioners received mail related to the Arizona property and paid dues to a homeowners association.

**[\*5]**  B.  <u>Idaho Property</u>

The Idaho property consists of two buildings separated by a gravel driveway on one lot of land.  One building is a three-bedroom house, and the other consists of a shop with a three-bay garage and six apartments, five of which are finished and the sixth used as storage for the shop.  The Idaho property is approximately nine miles south of McCall, Idaho, which is considered a resort town.  Petitioners placed the Idaho property in service as a rental property on September 4, 2007.

Petitioners rented the Idaho property to Dusty and Elise Bitton from September 2007 through the end of June 2009.  At some point in 2009 the Bittons signed an agreement with Mike Connor to sublease the shop and storage apartment to him and his business, Black Tip Supply.  In 2009 the Bittons were going through bankruptcy and did not make any rent payments to petitioners.  After the Bittons vacated the property, Mr. Connor entered into a rental agreement with petitioners in September 2009 to continue to use the shop and storage apartment for Black Tip Supply.  Petitioners charged Black Tip Supply rent of $600 per month under their agreement.  During the first half of 2009 petitioners decided to turn the Idaho property into a vacation rental when the Bittons' lease terminated.  The Bittons left the house in poor condition, and petitioners--primarily Ms. Rose--worked on restoring the house to a rentable state.

**[\*6]**  Ms. Rose's first 2009 trip to the Idaho property was from July 31 to August 18, accompanied by Mr. Rose and their children.  During this trip Ms. Rose took two of the children to Vancouver, Washington, for a two-week vision therapy.  She shopped in Vancouver and Portland, Oregon, during the week while her children were being treated and returned to the Idaho property on weekends.

Ms. Rose next traveled to the Idaho property on Labor Day weekend, September 5 through 7.  Mr. Rose and their children accompanied her.  He primarily kept the children occupied, but also assisted his wife with work, which included cleaning the house and assembling furniture and supplies.

From October 9 through 13, Ms. Rose again traveled to Idaho--this time alone--to clean and bring supplies to the Idaho property.  By the end of October 2009 petitioners believed that the house on the Idaho property was ready for a tenant, and they began to advertise it by word of mouth.

Ms. Rose and her family returned to the Idaho property on November 26--Thanksgiving--and she spent the holiday weekend cleaning both buildings and assembling furniture.  But in December, a water pipe burst and damaged a few of the apartments.  Petitioners hired a restoration company to remove the water and repaint the damaged rooms.  On December 26, Ms. Rose traveled to the Idaho property to make further repairs in connection with the burst pipe.  Mr. Rose and

**[*7]** their children also were at the Idaho property and stayed into the beginning of 2010. Mr. Rose took the children skiing and to see a movie; and after Mr. Rose returned to Alaska with their daughter, Ms. Rose dropped the remaining two children off for skiing lessons each day. Black Tip Supply continued to rent the shop and storage apartment in 2009, but no vacationers rented the house or any apartment.

Petitioners first rented the Idaho property to vacationers in February 2010 after posting it on www.VRBO.com, a vacation rental website. On March 10, Ms. Rose returned to the Idaho property to paint and deliver supplies for the rental units. Mr. Rose and their children joined her there during their spring break from school, and they all flew home on April 2. Ms. Rose's final trip to the Idaho property in 2010 was very brief--from April 23 to 24.

Petitioners did not own a snowmobile, a boat, or an all-terrain vehicle. At times during their stays at the Idaho property, Mr. Rose took their children skiing, fishing, or to see a movie, to keep them occupied. Ms. Rose did not participate in recreational activities while at the Idaho property, even when she dropped her children off for skiing lessons.

The rate petitioners charged each tenant for renting the Idaho property is unclear. The rate depended on whether a tenant rented the house, one or more

**[*8]** apartments, or both, and the record does not include any rental contracts. Checks in the record indicate that rates ranged from $118 to $436 per night but do not identify what part of the Idaho property was rented. Petitioners also required that tenants pay a refundable deposit, typically $300. Tenants could pay an additional $200 deposit to bring a pet.

Petitioners summarized their work in connection with the Idaho property in 2009 and 2010 in logs created in preparation for trial.[3] They used calendars--also created in preparation for trial--to compile their logs. They did not keep any contemporaneous logs, calendars, or documentation other than receipts as described below. Petitioners estimated in their logs that Ms. Rose worked a total of 1,030.5 hours in 2009 and 862 hours in 2010 on her rental properties. These estimates included packing for and traveling to and from the Idaho property, reviewing correspondence, completing administrative tasks (including log management), shopping for the Idaho property, eating meals alone or with her family, discussing the rental properties with Mr. Rose over dinner, and painting, cleaning, and assembling furniture.

---

[3] Most of the hours petitioners reported were for the Idaho property although some of petitioners' time reported spent on administrative tasks may have been for the Arizona property as well; their logs did not specify.

**[*9]** The only contemporaneous documentation in the record is petitioners'

subpoenaed bank records and receipts for 2009, 2010, and 2011.  The record also

includes receipts for 2012 with respect to the Idaho property.  The receipts cover

travel, expenses, meals, and purchases at various stores of food and other items.

Some of the receipts are barely legible, and some have handwritten marks

specifying which charges petitioners reported as real estate expenses and to which

property the expenses related.  In preparation for trial petitioners also compiled a

schedule of rental expenses reported for each year for both the Idaho and Arizona

properties.

C.  Abandonments

In late 2011 and early 2012 petitioners abandoned each of the Alaska,

Arizona, and Idaho properties.  Petitioners abandoned the Alaska property on

December 14, 2011.  In 2011 petitioners' lenders with respect to the Alaska

property filed Forms 1099-A, Acquisition or Abandonment of Secured Property.

Petitioners abandoned the Arizona and Idaho properties on January 5, 2012.  In

2012 petitioners' lenders filed Forms 1099-A with respect to both the Arizona and

Idaho properties.  The Forms 1099-A listed the following dates of acquisition, fair

market values, and outstanding principal balances:

[*10]

| Property | Lender | Date of acquisition | Fair market value | Outstanding balance |
|---|---|---|---|---|
| Alaska | Citimortgage | 12/14/2011 | $335,900 | $195,000 |
| | Wells Fargo | 9/20/2011 | 365,000 | 184,438 |
| Arizona | FHLMC | 1/5/2012 | 149,175 | 363,534 |
| | Wells Fargo | 1/5/2012 | 149,175 | 86,202 |
| Idaho | PNC | 1/5/2012 | 382,500 | 979,805 |

The box indicating that petitioners were personally liable for repayment of the debt was checked on each form. The evidence in the record suggests (although it is not clear) that the lenders took possession of the properties upon abandonment in full satisfaction of petitioners' debts.

D. Cash and Bank Accounts

Petitioners kept approximately $56,000 in cash from two large tax refunds in a home safe to conceal it from creditors. Petitioners did not keep specific records of how much money they kept in their safe, but the tax refunds and Christmas gift checks accounted for most of the cash they had. Petitioners had several bank accounts during the years in issue and transferred funds among those accounts at various times. The record does not include bank deposit records for any year before 2009, the first year before the Court.

[*11] II. Petitioners' Tax Returns

Petitioners retained an accountant to prepare their Forms 1040, U.S. Individual Income Tax Return, for the 2009 through 2012 tax years. For each of the years in issue, petitioners filed an untimely Form 1040. They filed their 2009 return on August 17, 2012, their 2010 return on December 12, 2012, their 2011 return on October 3, 2013, and their 2012 return on May 28, 2014.

A. 2009

On their 2009 Form 1040, petitioners reported $187,299 of wage income and adjusted gross income of $13,910. Much of their reported loss is attributable to Schedule E, on which they reported a rental real estate loss of $127,777. They reported $2,200 and $4,969 in rents received from the Idaho and Arizona properties,[4] respectively, on their 2009 Schedule E. This income was offset by $134,946 in reported expenses, including:

| Expense | Idaho property | Arizona property |
| --- | --- | --- |
| Depreciation | $50,257 | $14,556 |
| Cleaning & maintenance | 9,623 | -0- |

[4] It appears that petitioners understated their 2009 rental income attributable to the Idaho property. The record includes a check to petitioners from Black Tip Supply for $2,400. The memo line on that check reads "Sept Oct Nov Dec 09". Petitioners conceded that they received $2,400 in rental income in 2009.

| | | |
|---|---|---|
| [*12] Auto & travel | 9,170 | -0- |
| Utilities | 951 | 3,599 |
| Legal/professional fees | 1,632 | -0- |
| Other | 37,101 | 18 |
| Taxes | 1,316 | 2,814 |

### B. 2010

Petitioners reported $106,879 of wage income and a $40,211 loss as adjusted gross income on their 2010 Form 1040.  They also reported on their 2010 Form 4797, Sales of Business Property, $12,983 from the sale of a 2001 Ford Excursion.  Additionally, they reported $24,515 and $14,053 of rental income from the Idaho and Arizona properties, respectively, and $157,025 of rental real estate expenses on their 2010 Schedule E, including:

| Expense | Idaho property | Arizona property |
|---|---|---|
| Depreciation | $47,165 | $15,187 |
| Cleaning & maintenance | 6,917 | 50 |
| Auto & travel | 7,147 | -0- |
| Utilities | 15,504 | 22 |
| Legal/professional fees | 6,925 | -0- |
| Other | 39,044 | 1,867 |
| Repairs | 7,273 | -0- |
| Supplies | 1,675 | 60 |

[*13] Petitioners reported a total rental real estate loss of $118,457 on their 2010 Schedule E.

C. 2011

On their 2011 Form 1040, petitioners reported wage income of $175,318 and adjusted gross income of $71,829. They also reported $14,360 of rental income from the Idaho property and $105,784 of rental real estate expenses on their 2011 Schedule E. Petitioners included in their 2011 expenses those related to the Alaska property for the portion of 2011 after they moved to Washington, although there is no evidence that they ever rented the Alaska property. Their reported rental real estate expenses include:

| Expense | Idaho property | Arizona property | Alaska property |
| --- | --- | --- | --- |
| Depreciation | $45,371 | $15,187 | -0- |
| Cleaning & maintenance | 3,267 | -0- | $370 |
| Auto & travel | 7,899 | -0- | 213 |
| Legal/professional fees | 5,410 | -0- | -0- |
| Other[1] | 5,649 | 1,315 | -0- |

[1] The other expenses petitioners reported on their 2011 Schedule E included $2,826 for telephone expenses related to the Idaho property. The other expenses related to the Arizona property included $1,297 for association dues and $18 for postage.

[*14] Petitioners reported a total rental real estate loss of $91,424 on their 2011 Schedule E.

D. 2012

On their 2012 Form 1040, petitioners reported $156,238 of wage income and a loss of $162,691 as adjusted gross income. They reported on their 2012 Form 4797 a total business loss of $312,169: a $349,159 loss attributable to their abandonment of the Idaho property and to the sale of a computer, offset by a $36,990 gain attributable to their abandonment of the Arizona property. They also reported $600 of rental income from the Idaho property and $10,327 of rental real estate expenses on their 2012 Schedule E, including:

| Expense | Idaho property | Arizona property |
| --- | --- | --- |
| Depreciation | $2,052 | -0- |
| Auto & travel | 553 | -0- |
| Utilities | 2,070 | -0- |
| Legal/professional fees | 2,807 | -0- |

Petitioners reported a total rental real estate loss of $9,727 on their 2012 Schedule E.

[*15] III. Petitioners' Audit

Respondent performed a bank deposit analysis for years 2009 through 2012. On the basis of the bank deposit analysis, respondent determined that petitioners had unreported income of $56,000 for 2009, $35,415 for 2010, and $39,213 for 2012. Respondent amended his determinations of unreported income to $7,877 for 2009, $31,578 for 2010, and $13,921 for 2012 after conceding that some of the deposits included nontaxable allowances for housing and cost of living for active duty members of the military, cash that petitioners were holding in their home safe, an insurance payment for petitioners' damaged truck, and a cashier's check from petitioners' closure of some of their bank accounts.

The record includes a Civil Penalty Approval Form prepared by Examiner Diana Cravey, dated April 6 and 7, 2015. On the form, Examiner Cravey asserts both additions to tax under section 6651(a)(1) and penalties under section 6662 for negligence and/or substantial understatement for tax years 2009 through 2012. The space for "Group Manager Approval" has an electronic signature from Group Manager Dan Thompson, dated April 10, 2015. There was no formal communication of penalties giving petitioners the right to protest those penalties or challenge them in court before the notice of deficiency.

**[\*16]**                                    OPINION

I.  <u>Burden of Proof</u>

Ordinarily, the burden of proof in cases before the Court is on the taxpayer. Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Under section 7491(a), in certain circumstances the burden of proof may shift from the taxpayer to the Commissioner.  Petitioners have neither claimed nor shown that they have presented credible evidence sufficient to shift the burden of proof to respondent as to any relevant factual issue under section 7491(a).

II.  <u>Unreported Income</u>

Section 61(a) provides that gross income includes "all income from whatever source derived".  <u>See</u> <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 430 (1955).  Taxpayers are responsible for maintaining adequate books and records sufficient to establish their income.  <u>See</u> sec. 6001; <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991), <u>aff'd</u>, 959 F.2d 16 (2d Cir. 1992).  With respect to unreported income, the Commissioner must base his determination of a deficiency on "some substantive evidence" in order for the presumption of correctness to attach.  <u>Hardy v. Commissioner</u>, 181 F.3d 1002, 1004-1005 (9th Cir. 1999) (holding that third-party information returns were enough to satisfy the Commissioner's threshold burden), <u>aff'g</u> T.C. Memo. 1997-97.

**[*17]** The use of the bank deposit method has long been sanctioned by courts. Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), aff'd, 566 F.2d 2 (6th Cir. 1977). Bank deposits are prima facie evidence of income. Id. at 656-657; see also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The bank deposit method assumes that all money deposited in a taxpayer's bank account during a given period is taxable income, absent an explanation for the deposit. DiLeo v. Commissioner, 96 T.C. at 868. The taxpayer bears the burden of showing that the Commissioner's determinations of income are incorrect. Estate of Mason v. Commissioner, 64 T.C. at 656-657.

We often are skeptical of arguments based only on taxpayers' memory, recalling the details of activities years later. This case illustrates again why.

A. 2009

Respondent determined that petitioners failed to report $7,877 of taxable deposits, comprising multiple separate deposits from an Emigrant Bank account totaling $1,123, multiple cash deposits totaling $5,718, a $260 payment from a consignment shop, and a $776 deposit that petitioners conceded was taxable in their 2009 bank deposit schedule. Petitioners have not adequately explained the $1,123 in deposits from the Emigrant Bank account. They maintain that those were transfers between bank accounts they owned but admit that those deposits

**[*18]** were of 2008 checks and that they did not have an account with Emigrant Bank in 2008.

Petitioners adequately explained $3,800 of the $5,718 of cash deposits. These deposits exactly matched withdrawals from another account they owned, by both date and amount. Respondent also accepted petitioners' explanation as to these amounts. But petitioners failed to explain adequately the remaining $1,918 of cash deposits. Petitioners argued that one $600 deposit was cash that they had withdrawn in 2008; but the record does not include any 2008 bank deposit records to support this argument. Petitioners argued that another $655 cash deposit was withdrawn from another of their accounts. They point to a bank statement that shows a $682 ATM withdrawal from another account on the same day as the deposit. But they offer no other evidence to verify the source of the cash. And petitioners argued that two deposits were of cash from their safe, attributable to a dental insurance reimbursement and to a withdrawal from another of their accounts. Because petitioners kept no records with respect to their home safe, they have no way of showing that the cash deposited from their safe is attributable to the sources they claim. Mr. Rose testified at trial that petitioners

> received the two tax refund checks like we talked about. And that
> was the major cash that we had, other than perhaps a Christmas gift,
> you know, one of those types of checks. We did not have much cash.

[*19] So it wasn't very difficult to account for a couple of checks, 56 grand between a safe and a safe deposit box. It wasn't very difficult to keep track of it.

While we generally accept petitioners' explanation that they were moving money around between their accounts and their safe, especially where they memorialized the transfers by writing checks, they did not convince us that these transfers took place in these amounts. We question their ability to recall so many transactions so many years ago without contemporaneous documentation; and we question whether their default explanation of money transfers between their accounts and their safe can explain all of the deposits at issue. Petitioners' credibility is diminished by their reflexive tendency to claim that all of the deposits lacking another explanation were transfers either from another of their accounts or from their home safe. Their credibility is further reduced by their occasional inability to choose which explanation applied to a particular deposit, as we explain below. Without better records, and with the passage of time, their testimony is not enough.

Petitioners did not adequately explain the $260 deposit from a consignment shop. They argue it is nontaxable proceeds from the sale of household items but did not identify which items were sold to the consignment shop and what their bases in the items were (if any) at the time of the sale. Finally, petitioners

[*20] conceded that $776 of unreported deposits is taxable in the schedule of 2009 bank deposits that they prepared for trial.

Thus, we find that petitioners failed to report income of $4,077 for the 2009 tax year.

B. 2010

Respondent determined that petitioners failed to report $31,578 in taxable deposits for 2010, comprising $6,139 of cash deposits, a $107 deposit from petitioners' PayPal account, and $25,332 of unreported rental income. Petitioners have adequately explained $1,400 of the 2010 cash deposits. Those deposits corresponded to withdrawals on the same day and in the same amount from another account they owned.

However, petitioners fail adequately to explain the remaining $4,739 of cash deposits and the PayPal deposit. They argue that two deposits of $600 made a month apart were attributable to a $1,200 withdrawal that they made days before the first deposit. Petitioners argue that another deposit of $700 made on March 31, 2010, was attributable to two ATM withdrawals made on March 1 and 31, 2010, respectively, totaling $806. With respect to another $700 cash deposit, petitioners initially stated in their schedule of bank deposits that it was a check from another of their bank accounts but changed their position on brief, stating

**[*21]** that it was from their safe. Petitioners also claim that three cash deposits totaling $2,140 were from their safe and that the PayPal deposit was either proceeds from a sale of personal items or a refund. Petitioners provided no evidence beyond their testimony that these cash deposits correspond to withdrawals in different amounts and at different times. We again reject their unsupported testimony.

Respondent determined $63,900 of 2010 rental deposits on the basis of the bank deposit analysis, $25,332 more than the $38,568 that petitioners reported on their 2010 Schedule E. Petitioners acknowledged $50,624 of taxable rental deposits in their 2010 bank deposit schedule, accounting for $12,056 of the $25,332 of unreported rental income and leaving a balance of $13,276. Petitioners contend that the $13,276 is not taxable because it consists of security and pet deposits that they refunded to tenants. Petitioners' bank records contain evidence of only $7,745 in refunded deposits relating to tenants who made payments in 2010; they do not provide an adequate explanation for the remaining $5,531 of unreported rental deposits.

Between the $4,739 of unexplained cash deposits, the PayPal deposit, and the $17,587 of unreported rental payments, we find that petitioners failed to report $22,433 of income for the 2010 tax year.

**[*22]** C.  <u>2012</u>

Respondent determined that petitioners failed to report $13,921 of taxable deposits for 2012, comprising $671 from PayPal, $9,268 of proceeds from an auction of rental property, and $3,982 of unknown deposits.  Petitioners argue that the $671 PayPal deposit is not taxable because it was a refund and that the auction proceeds of $9,268 are not taxable because "the value of the items sold" was inevitably "exceeded by the cost of the items."  Petitioners did not provide any documentation of a refund from PayPal.  Nor did they provide any evidence of the items sold at auction or their bases in them.[5]  They cannot avoid tax with mere argument and speculation years later.  Evidence that they characterize as "persuasive enough" is not adequate to carry their burden, and citations of the "entire record" cannot cover up gaps in the record.

Petitioners have adequately explained $3,675 in unknown deposits:  a $2,000 gift from family members and a $1,675 refund of a $1,615 payment on a line of credit that they canceled plus a $60 service fee.  The memo line on the gift

---

[5] Petitioners argue that they had lost their rental properties by the time they deposited the proceeds of the auction and that their total basis in those rental properties was likely higher than the proceeds of the auction sale.  However, the only evidence in the record with respect to this deposit is the check from the auction house, which does not specify anything other than the amount paid, the date, the payor, and the recipient.

[*23] check reads "Christmas", and bank statements show prior payments of $1,615 on the line of credit. They have not adequately explained the remaining $307 in unknown deposits. They argue that a $100 cash deposit was a birthday gift but provide no evidence in support of that argument. They also argue that a $207 payment was both a refund from the bank and a transfer from another of their bank accounts but offer no evidence to support either explanation.

Thus, we find that petitioners failed to report income of $10,246 for the 2012 tax year.

## III. Real Estate Losses

### A. Petitioners' Use of the Idaho Property as a Residence

Respondent argues that petitioners used the Idaho property as a residence or a vacation rental for purposes of section 280A rather than as a residential or business rental property and, thus, are not entitled to deduct their rental real estate losses related to that property. Ordinarily, no deduction is allowed with respect to the personal residence of the taxpayer. Sec. 280A(a). A dwelling unit is considered to be a taxpayer's residence if its use for personal purposes exceeds the greater of 14 days or 10% of the days the unit is rented at a fair rental value in a taxable year. Sec. 280A(d)(1).

**[\*24]** A taxpayer is deemed to have used a dwelling unit for personal purposes when, for any part of a day, the taxpayer or any member of the taxpayer's family uses the unit for personal purposes or any individual uses the unit unless a fair rental is charged for the use. Sec. 280A(d)(2)(A), (C). However, use of the unit for repairs and maintenance on a substantially full-time basis will not be considered personal use merely because other individuals on the premises are engaged in some other activity. Sec. 280A(d)(2). Expenses directly attributable to the rental of the dwelling unit may be deducted, but the deduction is generally limited to a proportion of expenses equaling the proportion of the days the unit is used that it is rented at a fair value. Sec. 280A(c)(3), (e).

The Idaho property was rented for almost all of 2009, whether to the Bittons[6] or to Black Tip Supply, and much of 2010. There are no allegations that petitioners charged the Bittons a below-market rental. We also find that each of Ms. Rose's trips to the Idaho property--with the exception of the trip during which she took her children to Vancouver, Washington, for vision therapy--was for repair and maintenance. The fact that Mr. Rose and their children were present at the Idaho property and primarily engaged in recreational or other personal

---

[6] The Bittons defaulted on their rent payments as they went through bankruptcy; but because the record suggests that petitioners did charge them a fair rental, we will not deem this use personal.

[*25] activities while Ms. Rose was working does not change the principal purpose of her visits (repair and maintenance). See sec. 280A(d)(2). The time petitioners spent at the Idaho property for personal purposes--the stay during the 2009 vision therapy trip and spring break in 2010--totaled less than 14 days in each year. We conclude, therefore, that section 280A(e) does not limit the extent to which petitioners can deduct rental real estate losses with respect to the Idaho property.

B. Passive Loss Limitation

Section 469 limits the amount of a taxpayer's deductible loss from passive activities in a taxable year to the taxpayer's income from passive activities. Sec. 469(d)(1). Any loss from passive activities exceeding the income from such activities constitutes a passive activity loss and is disallowed for that taxable year but may be carried over to the next taxable year to offset passive activity income for that year. Id. subsecs. (a), (b), (d)(1). A passive activity is any activity involving the conduct of a trade or business--or an income-producing activity--in which a taxpayer does not materially participate. Id. subsec. (c)(1), (6). Material participation requires that a taxpayer be involved in the activity on a regular, continuous, and substantial basis. Id. subsec. (h)(1). The taxpayer may deduct any loss as a result of the passive activity loss limitation for the taxable year in

[*26] which she disposes of her entire interest in the passive activity.  Id. subsec. (g)(1).

Rental activity is ordinarily passive, regardless of whether a taxpayer meets the material participation requirement.  Id. subsec. (c)(2), (4).  Rental losses may be excepted from the section 469 limitation, however, if the taxpayer qualifies as a real estate professional.  Id. para. (7)(A).  A taxpayer qualifies as a real estate professional for a taxable year if she performs more than 750 hours of services in connection with real property trades or businesses, more than half of the personal services she performs are in connection with real property trades or businesses compared to other trades or businesses, and she materially participates in those real property trades or businesses.  Id. subpara. (B).  This real estate professional test applies separately to each spouse filing a joint return.  Id.

A taxpayer may prove that she qualifies as a real estate professional by any reasonable means.  Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).  Contemporaneous reports, logs, or similar documentation are not required if the taxpayer can establish her qualification by other reasonable means.  Id.  Reasonable means may include identifying services performed over a period of time and the approximate time spent performing those services, using appointment books, calendars, or narrative summaries.  Id.  But

[*27] "postevent ballpark guestimates" of hours do not suffice. E.g., Fowler v. Commissioner, T.C. Memo. 2002-223, 2002 WL 31005826, at *6; Bailey v. Commissioner, T.C. Memo. 2001-296, 2001 WL 1360438, at *6; Carlstedt v. Commissioner, T.C. Memo. 1997-331, 1997 WL 407788, at *8.

Respondent determined that Ms. Rose was not a real estate professional during the 2009 and 2010 tax years in part because she did not perform more than 750 service hours in connection with petitioners' rental properties in 2010.[7] Respondent, therefore, determined that petitioners cannot deduct their real estate losses until 2012, when they disposed of the Arizona and Idaho properties. Petitioners argue that Ms. Rose has shown that she meets the requirements on the basis of their logs.

Petitioners argue that their logs are reliable because they were prepared after "studying [p]etitioners' receipts, records, travel records, and * * * [Ms. Rose's] excellent memory." But petitioners' logs were not created contemporaneously with the activities. Rather, they were prepared using calendars that were not contemporaneous either. The calendars on which Ms. Rose based their logs do not break down how she spent her time while at the Idaho property. They simply

---

[7] Petitioners concede that Mr. Rose was not a real estate professional in 2009 and 2010 and that neither Mr. nor Ms. Rose was a real estate professional in 2011 or 2012.

[*28] indicate that those days were devoted to a "Real Estate Management Trip Idaho" without allowing time for sleep, personal hygiene, or meals.

Ms. Rose did allow time for sleep and meals in her logs, but they were not reasonable. For example, Ms. Rose routinely reports working 16-hour days on the properties and some days in excess of 18 hours, acknowledging breaks only for meals, typically half an hour each. This does not leave much time for sleeping, personal hygiene, or spending time with her young children.

Ms. Rose also reported working through the holidays that petitioners spent at the Idaho property; Thanksgiving 2009 was an 18.5-hour day that included shopping for over 2 hours during the afternoon and New Years Day 2010 was a 16.25-hour day. While we believe petitioners' testimony that Ms. Rose worked very hard, these hours are not plausible, especially with young children, even though Mr. Rose was supervising them. See Pohoski v. Commissioner, T.C. Memo. 1998-17, 1998 WL 7748, at *7 (rejecting as implausible testimony regarding time spent on a real estate trade or business that did not allow time for "breaks for meals, travel, or leisure time with the family--all of which certainly occurred"). Additionally, Ms. Rose included on the logs time she spent shopping for the Idaho property, even though she used those shopping trips for personal purchases as well. See infra section IV. And she included time spent to keep up

**[*29]** the logs, even though she testified they were compiled in preparation for trial, not contemporaneously. The inclusion of so much time for emails, shopping, log management, meals, dinner meetings, travel, and packing further erodes the logs' reliability.

Because these defects permeate the logs, we need not make specific adjustments to exclude categories of hours. The logs themselves are not reliable and therefore are not reasonable means of establishing real estate service hours. Nor are we persuaded by petitioners' repeated concessions on brief to eliminate defects identified by respondent. This is not a negotiation but rather an examination of the record to determine whether petitioners' logs and other evidence are reliable. Rather than improving their reliability, these repeated concessions highlight the logs' inherent unreliability.

The logs amount to "postevent ballpark guestimates" and do not establish that Ms. Rose performed more than 750 hours of services in connection with the Idaho and Arizona properties, even if we assume Ms. Rose materially participated in her rental real estate business. Therefore, she does not qualify as a real estate professional. Because Ms. Rose does not meet the exception to the passive loss limitation in section 469(c)(7), petitioners' rental real estate losses are suspended until 2012, when they disposed of the Arizona and Idaho properties.

**[*30]** IV.  Real Estate Expenses

Petitioners argue that they are entitled to deduct their rental real estate expenses under either section 162 or 212.  A taxpayer may deduct all ordinary and necessary expenses paid or incurred in a taxable year in carrying on any trade or business.  Sec. 162(a).  A taxpayer also may deduct all ordinary and necessary expenses paid or incurred in a taxable year relating to the management, conservation, or maintenance of rental real estate held for the production of income.  Sec. 212(2); sec. 1.212-1(h), Income Tax Regs.

> To qualify as a deduction under section 212, (ordinary and necessary expenses incurred for the conservation or maintenance of property) must satisfy the same requirements that apply to a trade or business expense under Section 162 except that the person claiming the deduction need not be in the trade or business.  * * *

Snyder v. United States, 674 F.2d 1359, 1364 (10th Cir. 1982) (quoting Fischer v. United States, 490 F.2d 218, 222 (7th Cir. 1973)).  Respondent conceded on brief that the rental properties were business properties at least for the later years, as we discuss infra section V.

Deductions are a matter of legislative grace, and taxpayers must prove their entitlement to deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Taxpayers, therefore, are required to substantiate expenses underlying each

**[*31]** claimed deduction by maintaining records sufficient to establish the amount of the deduction and to enable the Commissioner to determine the correct tax liability. Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001). Under the Cohan rule, the Court may estimate the amount of the expense if the taxpayers are able to demonstrate that they have paid or incurred a deductible expense but cannot substantiate the precise amount, as long as they produce credible evidence providing a basis for the Court to do so. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930).

Certain expenses, including travel, lodging, and meal expenses, are subject to the heightened substantiation requirements of section 274(d). Section 274(d) supersedes the Cohan rule. Sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). Section 274(d) contemplates that no deduction or credit shall be allowed on the basis of the taxpayers' mere approximations or unsupported testimony. To meet these strict requirements, taxpayers must substantiate the following by "adequate records" or by sufficient evidence corroborating their own statements: (1) the amount of the expense; (2) the time and place of the travel or use; and (3) the business purpose of the expense. Sec. 274(d). To substantiate by adequate records, taxpayers must provide: (1) an account book, log, or similar record; and (2) documentary evidence, which

[*32] together are sufficient to establish each element with respect to an expenditure. Sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). Although a contemporaneous log is not required, corroborative evidence to support the taxpayers' reconstruction "must have a high degree of probative value to elevate such statement" to the level of credibility of a contemporaneous record. Id. subpara. (1).

Respondent challenged certain of petitioners' Schedule E expenses for the 2009 through 2012 tax years on the basis that petitioners did not substantiate those expenses. We agree. Petitioners provided schedules of their expenses for each year containing references to thousands of photocopied and sometimes illegible receipts or bank statements and contend on brief that their reported expenses are "well enough documented". However, whenever confronted by respondent with specific problems regarding their reported expenses, petitioners conceded those expenses that respondent identified. Petitioners also point out on brief that they made significant concessions. But this is not a negotiation. Petitioners had an obligation to maintain adequate records and failed.

Our limited review of petitioners' documentation shows a recurring failure to separate personal from rental expenses. And on many of the receipts that we reviewed--to the extent we could make out the included charges--petitioners failed

[*33] to provide any connection between the expenses and their rental properties. For example, on one receipt from a drug store, petitioners marked four items as personal and failed to explain how other items were rental expenses. Those other items that petitioners claim are rental expenses include "1 Everyday Card", "1 TNCTN CHILL LCD SPRY", and "1 RA NAPR SODIUM CAP 50CT". Other receipts list clothing and DVDs. And petitioners included their entire grocery receipt from January 15, 2010.

Our very limited sampling is sufficient to establish that petitioners did not segregate personal expenses from rental expenses, notwithstanding their notations. While some of petitioners's expenses may have related to rental properties, petitioners failed to do the work necessary to separate personal from rental expenses. We will not do that work for them now. See Hale v. Commissioner, T.C. Memo. 2010-229, 2010 WL 4120880, at *2 ("In support of his claim that * * * he has adequately substantiated all of his deductions, petitioner offers us what amounts in effect to a shoebox full of papers. * * * We need not (and shall not) undertake the task of sorting through the voluminous evidence petitioner has provided in an attempt to see what is, and what is not, adequate substantiation of the items on petitioner's returns. Petitioner has failed to carry his burden of proving that respondent erred in determining the deficiencies in issue." (Fn. ref.

**[\*34]** omitted.)). Thus, petitioners have not satisfied their burden to maintain sufficient records, and respondent's determinations are sustained.

Respondent disallowed or limited petitioners' Schedule E deductions for the following expenses solely on the basis of their use of the Idaho property as a personal residence under section 280A: depreciation expense for tax years 2009 through 2012; utility expenses for 2009, 2010, and 2012; taxes for 2009; and supply and repair expenses for 2010. Because we concluded that petitioners were not subject to the limitation under section 280A, we also conclude that petitioners are entitled to substantiated deductions that respondent disallowed or limited solely on the basis of section 280A, subject to the limits imposed by section 469.

Respondent also argued that petitioners' 2009 rental expenses with respect to the Idaho property are startup expenditures under section 195 and must be capitalized. A startup expenditure is any amount paid or incurred in connection with investigating the creation or acquisition of an active trade or business; creating an active trade or business; or any activity engaged in for profit and for the production of income before the day on which the active trade or business begins, in anticipation of such activity's becoming an active trade or business, which, if paid or incurred in connection with the operation of an existing active trade or business, would be allowable for that taxable year. Sec. 195(c)(1).

[*35] Section 195 applies to both section 162 activities and section 212 activities. Toth v. Commissioner, 128 T.C. 1, 4 (2007); Hardy v. Commissioner, 93 T.C. 684, 692-693 (1989); see sec. 195(c). Rental activity must have commenced in order for related expenses to be considered ordinary and necessary. See Charlton v. Commissioner, 114 T.C. 333, 338 (2000); Woody v. Commissioner, T.C. Memo. 2009-93, 2009 WL 1230790, at *4, aff'd, 403 F. App'x 519 (D.C. Cir. 2010).

Even accepting respondent's premise that renting the Idaho property to vacationers was a new business distinct from their earlier 2009 rentals to the Bittons and Black Tip Supply, we have found that the Bittons and Black Tip Supply rented the Idaho property for a substantial part of 2009, and petitioners offered the property as a vacation rental in late 2009. We therefore conclude that petitioners' 2009 rental costs incurred were deductible rental expenses to the extent substantiated (and subject to the limits under section 469). See Charlton v. Commissioner, 114 T.C. at 338 (holding that the taxpayers' costs were startup expenditures because they did not at least offer the properties for rent).

V. Capital Gains/Losses, Business Loss, NOLs

Petitioners assigned error to several of respondent's determinations relating to the character of certain of their gains and losses and raised the issue of their entitlement to deduct a 2010 NOL in their pretrial memorandum. Petitioners

[*36] raised only one character issue in either their opening or answering brief, so we deem the others, including the 2010 NOL, to have been conceded.  See Money v. Commissioner, 89 T.C. 46, 48 (1987); Mallory v. Commissioner, T.C. Memo. 2016-110, at *14; Campbell v. Commissioner, T.C. Memo. 2001-51, 2001 WL 197899, at *12, aff'd, 28 F. App'x 613 (8th Cir. 2002).

The only character issue petitioners raised is whether their 2012 abandonment of the Idaho and Arizona properties resulted in an ordinary or capital loss.  Petitioners argue that these properties were used in their rental business and therefore their 2012 dispositions of these properties resulted in an NOL of $308,893.

Gains and losses from the disposition of depreciable real property used in a trade or business are not treated as capital gain or loss, except to the extent provided for in section 1231.  Sec. 1221(a)(2); sec. 1.1221-1(b), Income Tax Regs. Respondent in his answering brief conceded that the Idaho property was business property in 2010 and 2011 and did not dispute whether the Arizona property was business property.  But respondent did not concede the loss amount and contends that Rule 155 computations will be required.[8]  We agree.

_____

[8] Respondent has not argued that these were not sales or exchanges because they were abandonments of property securing recourse debt that was not

(continued...)

[*37] Respondent's notice of deficiency accepted petitioners' reported gain of $36,990 on abandonment of the Arizona property. We have ruled that section 280A does not apply to the Idaho property, and we have allowed deductions for some expenses but not others that will affect the size of losses carried forward to 2012 pursuant to section 469. Therefore, the treatment of petitioners' gain and loss from their dispositions of the Arizona and Idaho properties will depend on Rule 155 computations.[9]

VI. Penalties and Additions to Tax

The Commissioner bears the burden of production with respect to a taxpayer's liability for additions to tax and accuracy-related penalties, requiring the Commissioner to come forward with sufficient evidence indicating that imposition of the additions to tax and penalties is appropriate. See sec. 7491(c);

---

[8](...continued)
extinguished. Therefore we will treat these abandonments as sales or exchanges. See Freeland v. Commissioner, 74 T.C. 970, 975-976 (1980) ("It has been well established that where a taxpayer transfers property to his mortgagee in settlement of a mortgage obligation for which he is personally liable, any loss sustained by him will be deemed to have resulted from a sale or exchange on the ground that the taxpayer received consideration in return for transferring the property, the consideration being his release from liability."); see also Lockwood v. Commissioner, 94 T.C. 252, 260 (1990).

[9] Computations also should address whether the gain was double counted in respondent's notice of deficiency, as petitioners argue in their opening brief.

**[\*38]** <u>Higbee v. Commissioner</u>, 116 T.C. at 446.  In addition, the Commissioner must show that he complied with the procedural requirements of section 6751(b)(1) for the section 6662(a) accuracy-related penalty imposed.  <u>See</u> secs. 6751(b)(1), (2)(A), 7491(c); <u>Graev v. Commissioner</u>, 149 T.C. 485, 492-493 (2017), <u>supplementing and overruling in part</u> 147 T.C. 460 (2016).  Section 6751(b) requires the Commissioner to show that penalties assessed under section 6662 were "personally approved (in writing) by the immediate supervisor of the individual making such determination".  <u>See</u> <u>Graev v. Commissioner</u>, 149 T.C. at 492-493.

Once the Commissioner satisfies the burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination of additions to tax or penalties is incorrect or that the taxpayer has an affirmative defense such as reasonable cause.  <u>See</u> Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

A.  <u>Section 6651(a) Additions to Tax</u>

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a return timely unless it is shown that such failure is due to reasonable cause and not due to willful neglect.  <u>See</u> <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985).  Whether a taxpayer has "reasonable cause" within the meaning of section

**[\*39]** 6651(a)(1) depends on whether the taxpayer exercised "ordinary business care and prudence" but was nevertheless unable to file the return within the prescribed time. Boyle, 469 U.S. at 246; sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioners failed to file their Form 1040 timely for any of the years in issue. Petitioners do not address this issue on brief, and therefore we deem it conceded. See Money v. Commissioner, 89 T.C. at 48; Mallory v. Commissioner, at \*14; Campbell v. Commissioner, 2001 WL 197899, at \*12. We hold that they are liable for additions to tax for failure to file timely for the years at issue as determined by respondent.

### B. Section 6662(a) Penalties

Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment of tax required to be shown on a return that is attributable to "[n]egligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." Negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). We have defined negligence as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances. See Allen v. Commissioner, 92 T.C. 1, 12 (1989), aff'd, 925 F.2d 348 (9th Cir. 1991);

[*40] Neely v. Commissioner, 85 T.C. 934, 947 (1985). An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d).

A Civil Penalty Approval Form for the accuracy-related penalties, signed by the group manager before the first formal communication of penalties giving petitioners the right to challenge them (the notice of deficiency), is included in the record. See Clay v. Commissioner, 152 T.C. ___, ___ (slip op. at 44) (Apr. 24, 2019). Petitioners failed to keep sufficient records to document their income and expenses and Ms. Rose's work on their rental properties, as required. We hold therefore that respondent has met his burden of production for accuracy-related penalties attributable to negligence. The burden then shifts to petitioners to show that they had reasonable cause for the understatement and that they acted in good faith. See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 446-447.

The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's efforts to assess the proper tax liability. Id.; see Halby v. Commissioner, T.C. Memo. 2009-204. We also

[*41] consider the taxpayer's experience, knowledge, and education. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners have not shown reasonable cause for their underpayments of tax for the years in issue. They argued that they relied on their accountant and that they tried in good faith to comply with the tax law and to keep sufficient records. But they failed to explain what steps they took to comply beyond their vague claims. We have found throughout this opinion that petitioners' recordkeeping was insufficient. Their records do not reflect a reasonable attempt to comply with the rules and regulations. We therefore hold that petitioners are liable for understatement penalties attributable to negligence.

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.